Oliver J. TODD, Jr., et al., Petitioners,

v.

Hugh Carl BRUNER et al., Respondents.

No. A–8674.

Supreme Court of Texas.

Jan. 23, 1963.

Rehearing Denied March 13, 1963.

John Hamman, Houston, McClain & Harrell, Conroe, Butler, Binion, Rice & Cook, Houston (Arthur P. Terrell, Houston, with firm), for petitioners.

James M. Crane, Conroe, Howard Klein, Tomball, W. S. Barron, Jr., Dallas, for respondents.

NORVELL, Justice.

This case presents a cotenancy situation involving the ten year statute of limitation, Article 5510, Vernon's Ann.Tex. Stats. It is the settled law in this state that, "The possession of a cotenant or tenant in common will be presumed to be in right of the common title. He will not be permitted to claim the protection of the statute of limitations unless it clearly ap-

pears that he has repudiated the title of his cotenant and is holding adversely to it." Phillipson v. Flynn, 83 Tex. 580, 19 S.W. 136; Poenisch v. Quarnstrom, Tex.Sup.Ct., 361 S.W.2d 367.

The facts of this case require that the judgments of the trial court and the Court of Civil Appeals be reversed and a judgment entered for the petitioners as hereinafter directed.[1]

Oliver J. Todd, Jr., John J. Todd and John Hamman, are the record owners of an undivided three-fourths interest in a 214.87 acre tract of land out of the Bartley Murry Survey in Montgomery County, Texas. They brought an action in trespass to try title against Hugh Carl Bruner and wife, Lucy May Bruner, and George A. Klein and wife, Erna Klein, who pleaded the ten-year statute of limitation. Bruner purchased his interest in the 214.87 acre tract from the heirs and successors of Edwin McNeese. This interest, insofar as the record discloses, was an undivided one-fourth interest. The deed to him, however, which was executed and delivered in 1952, purported to convey all of the 214.87 acre tract, except a one-sixteenth royalty interest in the minerals. After receiving this conveyance, Bruner executed a deed to Klein which purported to convey a definitely described fourteen-acre tract.

As the case turns upon notice of a repudiation of cotenancy, some statement of the history of the title is essential to an understanding of our holding.

In 1901 the heirs of D. McNeese and Edwin McNeese became involved in litigation with Peter Josserand over lands in the Murry Survey. The D. McNeese interests were represented by Oliver J. Todd, an attorney of Beaumont, Texas, while the Edwin McNeese interests were represented by John Hamman, an attorney of Conroe, Texas. Both lawyers had powers of attorney and at the conclusion of the litigation both Todd and Hamman received undivided

---

1. The opinion of the Court of Civil Appeals is reported in 349 S.W.2d pp. 260 et seq.

interests in the tract which was the subject matter of the suit. In 1958 and after the death of Oliver J. Todd, his sons, Oliver J. Todd, Jr. and John Todd purchased all the D. McNeese interest in the tract of land which is the subject matter of this lawsuit.

The Todds, through their father's power of attorney and the purchase of the D. McNeese interest, acquired an undivided one-half interest in the 214.87 acre tract now in dispute. John Hamman holds one half of the Edwin McNeese interest under his power of attorney, being a one-fourth interest in the entire tract. As above mentioned the Edwin McNeese interest (with the exception of a one-sixteenth royalty interest which was reserved in the deed to Bruner), is now held by Bruner and his grantee Klein (14 acres).

■ From the time judgment was rendered in the case of McNeese v. Josserand in 1903 to some time in 1937, the land here involved was unenclosed grazing land and there was no one holding exclusive possession of the premises so as to qualify under the ten-year statute. It is undisputed that in 1953, a fence which had been constructed sometime shortly before January 1, 1938 lapsed into such a state of disrepair that it would no longer turn livestock and the property again assumed the status that it occupied prior to the time a fence was constructed, namely, that of an unenclosed area or field. The critical period of time was that between January 1, 1938 and December 1, 1953, and although there were four groups of owners of the property during such period, no distinction between or among them was attempted in the special issues submitted.[2] The four categories of owners were (1) the claimants under Edwin McNeese (sometimes referred to as the Round Rock McNeeses), (2) John Hamman, their attorney, (3) the claimants under D. McNeese (sometimes referred to as the San Antonio McNeeses) and (4) the Todds, holding under Oliver J. Todd, the attorney for the D. McNeese interests. The burden was upon respondents to show that notice of their repudiation of the co-tenancy relationship had been brought home to the petitioner-plaintiffs or those under whom they claim prior to December 1, 1943.

There is no evidence of actual notice of repudiation unless it can be found in the testimony of J. H. Smith, who was the husband of Lena B. Smith, one of the heirs of Edwin McNeese. At the time Smith's deposition was taken in 1959, he was 84 years of age and attempted to testify of occurrences which took place some 56 years befor—in 1903. Smith said he had gone to some land in Montgomery County (probably the Bartley Murry Survey) with John Hamman. The Edwin McNeeses had "made a trade (with Hamman) to get this land and

2. The special issues submitted (both being answered in the affirmative) are as follows: (Explanatory charges and definitions are omitted).

"SPECIAL ISSUE NO. 1
"Do you find from a preponderance of the evidence that the Defendants, Hugh Carl Bruner and wife Lucy May Bruner, and George A. Klein and wife Erna Klein, and those under whom they claim, either in person or through a tenant or tenants, or partly in person or partly through a tenant or tenants, have held peaceable and adverse possession of the lands in controversy, under an inclosure, cultivating, using or enjoying the same, or any part thereof, for any period of ten consecutive years after January 1, 1938 and prior to December 1, 1953?

"SPECIAL ISSUE NO. 2
"Do you find from a preponderance of the evidence that the Plaintiffs, Todd and Hamman, and those in privity of estate with them, knew that Defendants, Bruner and Klein, and those in privity of estate with them, were claiming the 214.-87 acres in controversy in this suit adverse to the Plaintiffs, Todd and Hamman, or that Defendants, Bruner and those in privity of estate with them, asserted an adverse possession against the Plaintiffs, of such unequivocal notoriety that said Plaintiffs would be presumed to have notice of such adverse claim?

clear up the title to it." Smith said, "We got on a train and rode it out there, and then the train stopped to get water, steam engine—there some way. It stopped and we got off. * * * We walked around on the land." As to what transpired while he and Mr. Hamman were looking at the land, Smith's testimony was as follows:

"Q: About when did this transaction take place between you and Mr. Hamman with reference to dividing the land? A: Dividing the lands?

"Q: If you recall? A: It was somewhere about 1903.

"Q: 1903. A: Uh huh.

"Q: All right, Sir. A: Its pretty hard for a fellow to recollect things that long."

(Here followed a rather lengthy colloquy between the Court and counsel for both sides. Counsel for petitioners, plaintiffs in the trial court, requested that the Court instruct the jury that this testimony could not be considered as against "the Todds or to anyone else that this gentleman was not acting for." This request was overruled by the Court).

"Q: I believe the last question was: 1903? A: Uh huh.

"Q: All right, sir. A: It's pretty hard for a fellow to recollect things that long.

"Q: Yes, I understand; I know it was a long time ago. Now, when you would make trips to these lands, say between the time you all divided them in 1903 and the time the fence was put up in the late thirties, would you go in company of anyone else? A: No, I don't think so. * * *

"Q: And when this division was made between you and Mr. Hamman was anyone there besides you and Mr. Hamman? A: No.

"Q: You were representing the—A. (interrupting) McNeese heirs?

"Q: The McNeese heirs. And he was representing himself and the other parties. A: Just himself as I recall."

Smith also gave some testimony about a survey being made. This apparently took place a number of years after 1903. He said that he had heard that the McNeeses had erected a fence, but was not present when the fence was built. He didn't know whether the land was surveyed or partitioned in accordance with his conversation with Mr. Hamman or not. "The way I understand it was; I don't—I don't think the way me and Mr. Hamman divided it— that is, that's the way the survey would be; I don't think Hamman had any of it at all— he was to get any of that—that was surveyed off."

At the time Smith's deposition was offered in evidence, numerous objections were sustained by the trial court to various questions and answers, and perhaps others should have been. What we have is the picture of a diligent lawyer doing his best with an elderly witness who had but a hazy memory of events which took place, if at all, some 56 years ago. The result,— and it is not an unusual one, was that most of the testimony as to a division or partition came from the lawyer's assumptions rather than from the witness. The testimony does not show an oral partition. Smith was the husband of one of the Edwin McNeese heirs. He did not purport to represent the D. McNeese interests nor the Todd interests. According to Smith, Hamman did not purport to represent these interests. But if we say that the owners of an undivided one-half interest met and attempted to partition the tract, just where were the lines to be run? What portion was Hamman to receive? If we initially consider a strained inference that in the 1903 transaction, Hamman agreed that he would own no part of the land that was subsequently enclosed by a fence some 34 years later we end up with a patent absurdity. The fence, according to respondent-defendants' theory of the case,

enclosed the entire tract now in dispute. The 1903 "partition" then was one under which Hamman received nothing and the Edwin McNeese interests, represented by Smith, received all. No one went into possession of the lands after the purported Smith-Hamman conversation of 1903 unless the 1937 fencing can be considered referable thereto and, as will be hereinafter noted, Hamman exercised rights of ownership with reference to the property long after 1903. No acquiescence in an agreement of division was ever shown. In fact, Smith never testified to any agreement in definite terms. The whole matter is left in such a nebulous and uncertain state that we must conclude that no evidence of a partition agreement was shown. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059.

Certainly Smith's 1903 conversation with Hamman could not support a ´nding of notice of a repudiation of the cotenant relationship insofar as the D. McNeese and Todd interests are concerned. We think the same is likewise true as to Hamman. In support of their affirmative claim of title by adverse possession, no attempt was made to suggest a distinction between the positions of the respective petitioners insofar as notice was concerned.[3] There is nothing in Smith's testimony that shows a clear repudiation of the title of their cotenants by the Edwin McNeese heirs from and after 1903.

We are also of the opinion that there is no support in the evidence for the finding that petitioners were charged with constructive notice of a repudiation of the cotenancy relationship. In Park v. Sweeten, Tex.Civ.App., 270 S.W.2d 687, affirmed by the Supreme Court under the style, Sweeten v. Park, 154 Tex. 266, 276 S.W.2d 794, it was pointed out that:

"The cases sustaining repudiation of tenancy by acts of unequivocal notoriety as distinguished from actual notice of repudiation, generally rely upon long continued possession and user coupled with non-claimer on the part of the true owner."

■ For respondent's case to stand, notice of repudiation must have been brought home to petitioners or their predecessors in title prior to December 1, 1943, that is, ten years prior to December 1, 1953. The land was not fenced until 1937. Insofar as notice by possession alone is concerned, we are primarily concerned with a six-year period. Possession during that time, coupled with circumstances existing prior thereto, must have been of such unequivocal notoriety as to presumedly convey to petitioners or their predecessors in title notice of the respondents' adverse claim.

■ Insofar as the true owner of property is concerned, there is a vast difference between the notice of adverse claim conveyed by the presence of a stranger in possession and that of a cotenant in possession. It is not unusual for one cotenant to have exclusive possession and make beneficial use of lands for rather long periods of time and ordinarily such use is with the acquiescence of the other cotenants. Cotenancy is a common form of land tenure when owners belong to the same family. This results largely by the operation of the statute of descent and distribution and commonly followed customs and practices relating to the making of devises of lands. The legal presumption follows a generally recognized habit or practice based upon years of observed experience. The statutes of limitation are statutes of repose. They are intended to settle and support land titles and are not designed to afford a method where-

3. The second special issue submitted to the jury purported to embrace the theories of actual and constructive knowledge of adverse claimer. The issue is probably defective, particularly in that no period of time relating to the acquisition of knowledge is inquired about. That question is not, however, before us. The issue is set forth in footnote No. 2.

by one member of a family may appropriate property belonging to his kinsman. Hence the legal requirement that notice of repudiation of the common title should be clear, unequivocal and unmistakable. In the present case, although the Edwin McNeese heirs lived in and about Round Rock, Texas, and the heirs of D. McNeese lived in San Antonio, Texas, no contention is made that the Round Rock McNeeses ever gave actual notice of their repudiation of the cotenancy relationship to the San Antonio McNeeses. Cotenancy-limitation situations often present the somewhat anomalous argument in which one cotenant in effect says, "Although I lived within a few miles of my cotenant, I never told him of my repudiation of our common title, but my actions with reference to the land itself were so unequivocal and notorious that he must have known of the repudiation that I never disclosed to him." [4] The real property statutes of limitations as to cotenants are not designed to run in secrecy and silence. Brown v. Bickford, Tex.Civ.App., 237 S.W. 2d 763, wr. ref. n. r. e. In the early case of Alexander v. Kennedy, 19 Tex. 488, Chief Justice Hemphill, writing for this Court, said:

"That the possession of one co-heir or co-tenant is the possession of the other co-heirs, and is taken in trust for their benefit, is an elementary and undisputable principle of law. But this possession may become adverse to the other heirs, by acts or declarations repelling the presumption that the possession is in the character of a co-heir, and which show clearly a claim of exclusive right. One tenant in common may disseize or hold adversely to another tenant in common; but the hostile intent of the possession should be manifested by acts of a more unequivocal character than would be necessary in

ordinary cases, where there is no privity of estate between the claimants to the property.

"The difference, says Judge Story, between the two cases is, that acts which, if done by a stranger, would per se be a disseizin, are, in the case of tenancies in common, susceptible of explanation consistently with the real title. Acts of ownership in tenancies in common are not necessarily acts of disseizin. It depends on the intent with which they are done, and their notoriety. The law does not presume that one tenant in common intends to oust another. The fact must be notorious, and the intent must be established by proof. Prescott et al. v. Nevers et al., 4 Mason, 326–31; vide 9 Cow. 24."

▮▮ Any cotenant has a right to be in the possession of property in which he owns an interest, hence if the acts of the respondents and their predecessors in title are susceptible of explanation consistent with the existence of the common title then such acts cannot be such as to give constructive notice to the cotenants out of possession. Southern Pine Lumber Co. v. Hart, 161 Tex. 357, 340 S.W.2d 775, citing 4 Tiffany on Real Property (3rd ed.) 526, § 1185; 4 Thompson on Real Property (Perm. ed.) 405, §§ 1881 et seq.

▮ Possession, coupled with payment of taxes, is not notice to a cotenant of a repudiation of the common title. Stiles v. Hawkins, Tex.Com.App., 207 S.W. 89; Poenisch v. Quarnstrom, Tex.Sup.Ct., 361 S.W.2d 367.

▮ The cutting of timber is not in itself notice of repudiation of a cotenant's title, although it may give rise to a right for an accounting. Kirby Lumber Co. v.

---

4. The situation brings to mind the colloquy from the cross examination which occurred in a case which may be either apocryphal or illustrative of a number of cotenancy cases, viz:

"Q. You say you repudiated the cotenancy in 1924. Why didn't you tell Mr. Roe (the cotenant out of possession) of this when you saw him? A. Because if I did, I figured he would sue me."

Temple Lumber Co., 125 Tex. 284, 83 S.W. 2d 638.

In Killough v. Hinds, 161 Tex. 178, 338 S.W.2d 707, this Court said:

"We believe that none of these facts (selling water for use off the premises and allowing an employee to construct a small house on the land in dispute) including the erection of the barn, pig pen, chicken house and the grazing of milk cows, all of which were relied on to show adverse possession were at all inconsistent with the permissive use and the right by which Hinds entered upon and occupied the property and built his residence, nor are they sufficient as a matter of law to afford the record owner constructive notice of a repudiation of that permissive use. * * *

"The rule is thus stated in Davis v. Lund, Tex.Com.App., 41 S.W.2d 57: When A enters upon the land in recognition of the title of B, in order for A to prevail under the 10-year statute of limitations three things must be established, (1) there must be a repudiation of the relationship thus established and claim of title adversely to that of B; (2) this repudiation and adverse claim must be clearly brought home to B as limitations will only begin to run from that date; (3) there must be adverse possession for 10 years after notice of repudiation and adverse claim has been brought home to B."

The authorities are in agreement upon the proposition that the law point is the same in a cotenant case as it is in a landlord and tenant situation. In commenting upon Sweeten v. Park, 154 Tex. 266, 276 S. W.2d 794, it was said in the Texas Law Review that:

"In Sweeten v. Park the Texas Supreme Court has set forth the doctrine which should become the basis of all future law in the area of adverse possession by tenants. Its soundness is attested by the fact that it is the rule in the majority of American jurisdictions. The policy of permitting a tenant to acquire a limitation title against his landlord by only ordinary acts of ownership may have been suited to a frontier society in which land titles were relatively unstable at best. It loses its validity, however, in a settled society in which stability is achieved largely through registration of deeds and other written documents. For the protection both of the landlord under whom the tenant enters and of persons who may later purchase from him, it is essential that the acquisition of title by a tenant be made dependent upon clear and unequivocal notice of his repudiation of the tenancy and his intention to claim the land for himself." Betty Jo Wiest Christian, "Adverse Possession by Tenants in Texas," 38 Tex.Law Review 320.

█ It was conclusively shown that after 1903, (the date of the occurrence upon which respondents apparently rely to carry notice of repudiation to the petitioners and their predecessors in title), the petitioners or those under whom they hold executed legal instruments affecting the lands involved and thus evidenced their continuing claim to the subject matter of this suit. In 1923, Oliver J. Todd and John Hamman executed a conveyance of a pipe line easement across the premises. In 1932 some of the D. McNeese heirs joined with the Edwin McNeese heirs in executing an oil and gas lease. In 1933, both Todd and Hamman executed timber deeds to the Grogan-Cochran Lumber Company. In 1949 Oliver J. Todd, Jr. and John D. Todd executed a right of way deed to the Sinclair Pipe Line Company. All of these instruments were duly recorded in Montgomery County. There was no evidence of long non-claimer on the part of the cotenants out of possession. This circum-

**162**

stance in itself serves to distinguish the present case from that of Moore v. Knight, 127 Tex. 610, 94 S.W.2d 1137, cited by the Court of Civil Appeals. In Moore v. Knight, the Court held that "[l]ong-continued possession and assertion of claim by one tenant" was an important factor in establishing constructive notice of a repudiation of cotenancy, but also held that an important circumstance bearing on the problem was *the nonclaim on the part of one out of possession.* See also, Illg v. Garcia, 92 Tex. 251, 47 S.W. 717. The time period involved and the absence of a showing of nonclaimer fully distinguishes Moore v. Knight and Vasquez v. Meaders, 156 Tex. 28, 291 S.W.2d 926 from the case presently before us. Brown v. Bickford, Tex.Civ.App., 237 S.W.2d 763, ref. n. r. e. See also, Condra v. Grogan Mfg. Co., 149 Tex. 380, 233 S.W.2d 565; Killough v. Hinds, 161 Tex. 178, 338 S.W.2d 707; Harris v. Mayfield, Tex.Com.App., 260 S.W. 835, holdings approved by the Supreme Court; 2 Tex.Jur.2d 100, Adverse Possession § 35; 3 Am.Jur.2d 260. Adverse Possession §§ 174–76; Annotation 121 A.L.R. 1411; Louis v. Muldrow, "The Adverseness of Possession to Fractional Interests," 9 Baylor Law Review 168.

We sustain petitioners' point of error. The trial court should have granted petitioner-plaintiffs' motion for judgment non obstante veredicto. The judgments of the courts below are reversed and this cause remanded to the District Court with instructions to forthwith enter judgment in favor of the petitioner-plaintiffs for title and possession of an undivided three-fourths interest in and to that certain tract of land situated in Montgomery County, Texas containing 214.87 acres, more or less, which is described in petitioner-plaintiffs' second amended original petition, together with all costs of suit.

Reversed and remanded with instructions to render judgment.

GRIFFIN, J., dissenting.