J. Eddie DYER, Appellant,

v.

Ronald COTTON, Appellee.

No. 01–09–00228–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Nov. 18, 2010.

Stephen G. Hunt, Bond, Hunt, French & Company, PLLC, Houston, TX, for Appellant.

Mark E. Roberts, Roberts & Castro, Houston, TX, for Appellee.

Panel consists of Justices KEYES, HIGLEY, and BLAND.

## OPINION

JANE BLAND, Justice.

In this trespass to try title suit, Eddie Dyer sued Ronald Cotton, claiming that, in addition to procuring an undivided 1/7th

interest to farmland in Grimes County by conveyance, he also had acquired title to the remaining 6/7th interest by adverse possession. A jury disagreed, finding that Dyer had not adversely possessed the property, and the trial court signed a take-nothing judgment against Dyer. On appeal, Dyer contends that no legally or factually sufficient evidence supports the jury's finding that Dyer had failed to acquire title to the farmland by adverse possession. He further contends that the trial court erred by (1) including a jury instruction requiring Dyer to establish ouster of his other co-tenants to prove adverse possession; (2) allowing evidence of other adverse possession and property dispute lawsuits in which Dyer was involved; and (3) allowing the testimony of a witness whom Cotton did not properly disclose during discovery and whose testimony violated the parol evidence rule. We conclude that sufficient evidence supports the jury's verdict and that the trial court did not abuse its discretion in its jury instructions or evidentiary rulings. We therefore affirm.

## Background

Carrie Venters owned 46.646 acres of farmland in Grimes County. When she died intestate in 1958, the property passed to her seven children in equal, undivided interests under the laws of succession. A house stood within a thirty-two-acre wooded area on part of the property. Another approximately eleven-acre portion was cleared and used for grazing and farming. The property also had a tank pond, which a nearby church periodically used for baptisms. An old, three-strand, barbed-wire fence surrounded the property.

During his lifetime, Carrie Venters' son, Lee "Snap" Venters, used the property for growing hay and grazing cattle. Snap repaired the old fence when it broke through. He also harvested timber from the property. His siblings occasionally visited the property to hunt and fish.

During the 1970s, Snap became acquainted with Dyer when Dyer bought a tract of land next to the Venters property. Snap allowed Dyer's cattle to graze on the property and let Dyer gather hay from the property. According to Snap's daughter, Brenda Miller, Snap "and Mr. Dyer were friends; and if he needed to go buy something, Mr. Dyer would help him with it; and he would pay him back." It was not unusual for Snap's children to see Dyer's cattle running together with Snap's cattle on the property. When part of the fence came down, Snap and Dyer worked together to repair it. In the early 1990s, Snap and Dyer traded some property, which allowed Dyer to build a road through the property so that he could drive to his house from the main road. Later, when Snap became ill and could not check on his cattle as often as he used to, Dyer tended to them and fed them.

Meanwhile, Angeline Keel, Snap's sister and a co-tenant, died intestate in 1981. Her undivided 1/7th interest in the property passed to her daughter, Carrie Young. Young sold her interest to individuals outside the Venters family, Roy Godwin and Jack Baker. In 1986, Godwin conveyed his portion of the interest to Baker, so that Baker held the entire 1/7th undivided interest.

After Snap's death in 1994, Dyer bought Baker's interest in the property. Despite the fact that Baker held only a fractional interest, however, the special warranty deed he executed purported to convey the entire Venters property to Dyer. Baker testified that, before the conveyance, he informed Dyer that he did not own a fee interest in the property and was therefore selling only what he owned—what had been Carrie Young's undivided 1/7th interest. The special warranty deed from Baker to Dyer stated "That we, JACK W. BAKER and wife, JACQUELYN V. BAK-

ER ... do Grant, Sell and Convey unto EDDIE DYER ... all of the following described real property in Grimes County, Texas, to-wit: [description of the Venters property]." The deed expressly reserves a mineral interest in Baker, but does not mention that he held only a 1/7th interest in the surface estate. Over twelve years later—shortly before trial—Baker learned of the mistake in the deed.

Also after Snap's death, Dyer called and wrote Miller asking if he could purchase the interest in the property she had inherited from her father. In turn, Miller's sister, Myrtle Hatchett, then called Dyer to introduce herself, and Dyer asked if he could buy her interest. Hatchett responded to Dyer's inquiry to her that she couldn't because it was undivided land.

Throughout this period, the Venters heirs continued to visit the property, but as they advanced in years, they did not visit as often as in the past. Snap's sister, Birdetta Edwards, visited to gather firewood from the property and fish in the tank pond about four or five times a year. On one of those visits, Edwards installed locks on the gate, but she found them cut off on her next visit. On later visits, she found the old fence had been replaced with a four-strand barbed wire fence and that someone had removed the gate. She crawled through the fence to enter the property. Dyer never forbid her to go on the property, or told her that she was a trespasser. She never saw a "no trespassing" sign on the property.

Miller heard from her Aunt Birdetta that Dyer had stopped people from entering the property, but she visited about twice a year without a problem. Dyer never communicated with Edwards regarding the gates to the property, nor did he tell Ruby Hunter, another of Snap's sisters, that she could not cut timber on the property. Miller disagreed with Dyer that the land had physically changed since

her father had owned a part of it. Dyer never indicated to her that he claimed the entire property as his own to the exclusion of the other individual interests. Hatchett agreed with Miller and Edwards on the property's appearance. She observed that the land always had been used for growing hay and cattle grazing. Hatchett and her son walked around the property once or twice a year since Snap's death, and they never had trouble entering it. The gate had a chain and a lock hanging on it, but it was unlocked when she visited, and she freely entered. Hatchett, like her sister, stated that it never looked as though Dyer was attempting to claim the property as his own, and none of the Venters heirs were concerned about this possibility.

Birdetta assumed responsibility for paying the family's taxes on the property. Dyer acknowledged that he paid taxes on a fractional undivided interest and understood that the other co-tenants paid the remainder of the taxes owed on the property.

In 2005, Ronald Cotton approached the Venters heirs concerning his interest in buying the property. He visited the property with Edwards several times. Cotton did not see any "no trespassing" signs, and they had no trouble entering the property. They slipped through the fence and walked the property while Edwards pointed out the barn, the pond, the old homestead, and the wooded area. Edwards informed Cotton that Dyer held an interest in the property, and that they were able to convey only their 6/7th interest to him.

Before buying the property, Cotton visited it with a surveyor. As they examined an area near Dyer's barn that adjoined the Venters farmland, Dyer's wife noticed them and told them that they could not survey the property. In a separate incident, Dyer's wife confronted a different set of surveyors, who left when she called the

sheriff's department. Dyer's daughter photographed yet another group of surveyors Cotton hired that walked in the hayfield on the property. Cotton ultimately demonstrated to the sheriff's department that he had permission to enter the property, and he completed the survey.

In connection with the proposed purchase, Cotton consulted Bonnie Armstrong, the owner of Navasota Abstract and Title Company and Grimes County Title, to conduct a title search and provide title insurance. Armstrong informed Cotton that, due to the deed from Baker, Dyer owned a 1/7th interest in the property. Although nothing indicated to Armstrong that Dyer owned more than that interest or was attempting to gain title to the entire property through adverse possession, she included an exception in the title insurance policy relating to Dyer's claim. She warned that Dyer might assert a possessory claim to the 6/7th interest. Cotton nevertheless purchased the 6/7th interest from the Venters heirs.

At trial, Dyer contended that he was entitled to claim title under the ten-year adverse possession statute because he started possessing and continuously using the property in 1994. The jury found that Dyer did not adversely possess the Venters estate, and the trial court entered judgment on the jury's verdict.

## Discussion

*I. Adverse possession*

*A. Standards of review*

Dyer contends that he established adverse possession as a matter of law, and that no evidence or factually insufficient evidence supports the jury's finding that Dyer did not adversely possess the property. Because Dyer attacks the evidentiary sufficiency of an adverse jury finding on which he had the burden of proof, he must demonstrate that the evidence conclusively establishes, as a matter of law, all facts in support of the issue, or, alternatively, that the jury's adverse finding is against the great weight and preponderance of the evidence. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Harris County v. Vernagallo*, 181 S.W.3d 17, 29 (Tex.App.-Houston [14th Dist.] 2005, pet. denied).

We view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See Del Lago Partners v. Smith*, 307 S.W.3d 762, 770 (Tex.2010). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id.*

In a factual sufficiency review, we consider, weigh, and examine all of the evidence that supports or contradicts the jury's determination. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001); *London v. London*, 192 S.W.3d 6, 14–15 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). We set aside the verdict only if the evidence that supports the jury's finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *Cain*, 709 S.W.2d at 176; *Nip v. Checkpoint Sys., Inc.*, 154 S.W.3d 767, 769 (Tex.App.-Houston [14th Dist.] 2004, no pet.). We defer to the jury's findings on contested evidence—the jury may believe one witness and disbelieve another, and it may resolve inconsistencies in any testimony. *Eberle v. Adams*, 73 S.W.3d 322, 327 (Tex.App.-Houston [1st Dist.] 2001, pet. denied).

Dyer also complains of error in the trial court's instruction to the jury. We review that issue before considering his evidentiary challenge so that we can measure the evidentiary sufficiency against the correct standard—either the jury charge as actu-

ally submitted, which Dyer claims was defective, or against the charge that the trial court should have submitted. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex.2000).

In a jury trial, the trial court shall submit "such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX.R. CIV. P. 277. A valid instruction (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence. *Union Pac. R.R. v. Williams*, 85 S.W.3d 162, 166 (Tex.2002). The trial court has considerable discretion in deciding whether a proposed instruction is necessary and proper to submit to the jury. *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 451–52 (Tex.1997); *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 746 (Tex.App.-Fort Worth 2008, pet. dism'd) ("Indeed, a trial court is afforded even more discretion when submitting instructions than when submitting questions." (citing *Wal–Mart Stores, Inc. v. Middleton*, 982 S.W.2d 468, 470 (Tex.App.-San Antonio 1998, pet. denied))). We will not disturb the trial court's decision on which instructions to submit to the jury absent an abuse of discretion. *McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573, 584 (Tex. App.-Houston [1st Dist.] 2007, pet. denied). If the trial court submits an incorrect jury instruction, we reverse only if the record shows that the given instruction was reasonably calculated to, and probably did, cause the rendition of an improper judgment. *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 757 (Tex.2006) (citing *Reinhart v. Young*, 906 S.W.2d 471, 473 (Tex.1995), and TEX.R.APP. P. 61.1(a)).

*B. Law of adverse possession*

Adverse possession is the "actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." TEX. CIV. PRAC. & REM.CODE ANN. § 16.021(a)

(Vernon 2002). To prove adverse possession, a claimant must establish six elements: (1) actual possession of the disputed property, (2) that is open and notorious, (3) that is peaceable, (4) under a claim of right, (5) that is adverse or hostile to the claim of the owner, and (6) consistent and continuous for the duration of the statutory period. *Glover v. Union Pac. R.R.*, 187 S.W.3d 201, 213 (Tex.App.-Texarkana 2006, pet. denied); *see also Rhodes v. Cahill*, 802 S.W.2d 643, 645 (Tex.1990). In this case, the appropriate statutory time period is ten years. TEX. CIV. PRAC. & REM.CODE ANN. § 16.026(a) (Vernon 2002). To establish adverse possession under this statute, the claimant must demonstrate that he actually and visibly appropriated the land for ten or more consecutive years, such that his use of the land gives the true owner notice of the hostile claim. *Rhodes*, 802 S.W.2d at 645; *see also Masonic Bldg. Ass'n v. McWhorter*, 177 S.W.3d 465, 472 (Tex.App.-Houston [1st Dist.] 2005, no pet.) ("The test for hostility is whether the acts performed by the claimant on the land and the use made of the land were of such a nature and character as to reasonably notify the true owner of the land that a hostile claim was being asserted to the property."). The possession of the land must "indicate unmistakably an assertion of a claim of exclusive ownership in the occupant." *Rhodes*, 802 S.W.2d at 645 (quoting *Rick v. Grubbs*, 147 Tex. 267, 214 S.W.2d 925, 927 (1948)). If "no verbal assertion of claim to the land [is] brought to the knowledge of the landowner, the adverse possession must be so open and notorious and manifested by such open or visible act or acts that knowledge on the part of the owner will be presumed." *Orsborn v. Deep Rock Oil Corp.*, 153 Tex. 281, 267 S.W.2d 781, 787 (1954).

"[A] co-tenant may not adversely possess against another co-tenant unless it clearly appears he has repudiated the title

of his co-tenant and is holding adversely to it." *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 750 (Tex.2003) (citing *Todd v. Bruner,* 365 S.W.2d 155, 156 (Tex.1963)). Whether there has been a repudiation of a non-possessory co-tenant's title generally is a question of fact, but when the pertinent facts are undisputed, repudiation may be established as a matter of law. *Id.*

C. *Jury instruction*

■ Dyer contends that the trial court erred by instructing the jury that Dyer had to prove that he ousted his fellow co-tenants or otherwise repudiated the co-tenancy relationship to establish his claim for adverse possession. At trial, Dyer timely objected to this instruction:

> You are further instructed that the possession by an owner of an interest in property will be presumed to be his right as a co-owner. The possession, to be adverse to the other owner, or owners, must be of such acts as to amount to an ouster of the other owner, or owners, and must be of such an unequivocal nature and so distinctly hostile to the others' rights that the intention to claim the property is clear and unmistakable.

Dyer claims that the deed from Baker, which purported to convey the entire fee simple estate to Dyer, and not his actual 1/7th interest, amounted to a repudiation of the co-tenancy relationship as a matter of law, relieving Dyer of the requirement to prove ouster to establish adverse possession. Relying on *Evans v. Covington,* 795 S.W.2d 806 (Tex.App.-Texarkana 1990, no writ) and *Easterling v. Williamson,* 279 S.W.2d 907 (Tex.Civ.App.-Dallas 1955, no writ), Dyer contends that, by claiming title

in a conveyance that purported to convey the entire title to him—a conveyance that went unchallenged for the length of the statutory period—the co-tenancy relationship ceased to exist, and he was entitled to take actual title through adverse possession. *See Evans,* 795 S.W.2d at 806; *Easterling,* 279 S.W.2d at 909.

In *Evans,* the Texarkana court of appeals affirmed a judgment rejecting an adverse possession claim. 795 S.W.2d at 808. The appellate court noted that the unsuccessful claimant did not oust the other co-tenant from the property, observing that "an exception would apply" if he had entered into possession as a trespasser before obtaining deeds from the co-owners, or had procured conveyances purporting to convey the entire title to the land. *Id.* As support for that observation, the Texarkana court cited *Republic Production Co. v. Lee,* 132 Tex. 254, 121 S.W.2d 973 (1938). *Lee* involved an adverse possession claim brought against a widower by his deceased wife's mother and four surviving siblings, who, unaware that the widower had any claim to ownership, had partitioned the land into five parts. 121 S.W.2d at 977. *Lee* recites the rule that a partition by two or more co-tenants, when followed by exclusion of a fellow co-tenant, "constitutes a complete and unequivocal repudiation of the co-tenancy relationship." *Id.* But *Lee* does not hold that a deed purporting to convey an interest greater than that held by the co-tenant is sufficient, standing alone, to prove adverse possession. There, the siblings fenced and built residences on the tracts, and they claimed and exclusively held the properties continuously for more than twenty years.[1]

---

1. The court relied on *Honea v. Arledge,* 56 Tex.Civ.App. 296, 120 S.W. 508 (1909, writ ref'd), as "[p]erhaps the best expression ... as to the effect of a partition." *Rep. Prod. Co. v. Lee,* 132 Tex. 254, 121 S.W.2d 973, 977 (1938). In *Honea,* the *Lee* court observed that the partition "proceeding, by its publicity and

nature, was so notorious and adverse that it was sufficient to constitute an ouster of the appellant, and the court had the right to assume as a matter of law that a disseisin was thereby accomplished, which, *if followed by the necessary adverse holding,* would ripen

*See id.* And *Evans* did not deviate from that position, reflecting that the record showed conflicting evidence of repudiation, as well as acts and possession consistent with the existence of the co-tenancy. 795 S.W.2d at 808.

In *Easterling,* the Dallas court of appeals likewise applied the rule that a co-tenant claiming through adverse possession bears the burden to show not only actual possession, but an ouster of the co-tenant not in possession. 279 S.W.2d at 909. It does not support Dyer's position that he may prevail as a matter of law on his adverse possession claim simply by recording an erroneous special warranty deed from Baker.[2]

 Other pertinent authority undermines Dyer's position. First, co-tenants are not agents; a co-tenant may not convey more than his interest in the shared property. *See Thomas v. Sw. Settlement & Dev. Co.,* 132 Tex. 413, 123 S.W.2d 290, 297 (1939) ("A deed by one co-tenant purporting to convey the entire interest in a part of the commonly owned land conveys such interest, and only such interest, in the land as the maker of the deed possesses."); *Home Owners' Loan Corp. v. Cilley,* 125 S.W.2d 313, 316 (Tex. Civ.App.-Amarillo 1939, writ ref'd) (declaring that co-tenant, in dealing with third persons under ordinary circumstances, may not bind another co-tenant through any act in relation to common property, and conveyance by co-tenant purporting to convey entire property interest conveys only interest possessed by grantor and is ineffective as conveyance of interest owned by non-joining co-tenant); *see also Keels v.*

*Keels,* 427 S.W.2d 913, 916 (Tex.Civ.App.-Tyler 1968, no writ) ("[T]he mere recording of a deed to a claimant who initially entered into possession as a permissive user is no evidence of an adverse holding or the repudiation of the tenancy.") (citing *Udell v. Peak,* 70 Tex. 547, 7 S.W. 786 (1888)). Second, a deed puts co-tenants on constructive notice of an adverse claim only if it is on record before they acquire their interests. The recordation of a deed after the other co-tenants have already acquired their property interests does not put those co-tenants on constructive notice that their co-tenant claimed an adverse interest. *Spiller v. Woodard,* 809 S.W.2d 624, 627 (Tex.App.-Houston [1st Dist.] 1991, no writ). "[R]ecord notice goes forward, not backwards." *Id.* Here, Dyer does not contend that he adversely possessed the land against Cotton's right to it, but instead against the right of Cotton's predecessors in title, who acquired title before the Baker conveyance to Dyer. The deed thus does not relieve Dyer of his burden to prove his adverse possession claim according to the usual stringent, fact-intensive standard.

 Because co-tenants to an undivided estate have an equal right to "enter upon the common estate and a corollary right to possession," a co-tenant seeking to establish title by adverse possession must prove, in addition to the usual adverse possession requirements, an ouster of the co-tenant not in possession or a repudiation of the co-tenancy relationship. *Byrom v. Pendley,* 717 S.W.2d 602, 605 (Tex. 1986); *see Todd,* 365 S.W.2d at 160; *Rep.*

into a title by limitation." *Id.* (emphasis added).

**2.** Unlike a general warranty deed, which expressly binds the grantor to defend against title defects created by himself and all prior titleholders, the grantor under a special warranty deed is bound to defend the title only

against the claims and demands of the grantor and all persons claiming through him. *Munawar v. Cadle Co.,* 2 S.W.3d 12, 16 (Tex. App.-Corpus Christi 1999, no pet.). Thus, the recordation of the special warranty deed does not, by itself, provide notice to the co-tenants of Dyer's adverse claim to the entire property.

*Prod. Co.,* 121 S.W.2d at 977. "Possession by one co-tenant, or by one claiming under a co-tenant, is not sufficient to give notice of a claim by that co-tenant adverse to the interest of the other co-tenant." *Gibraltar Sav. Ass'n v. Martin,* 784 S.W.2d 555, 559 (Tex.App.-Amarillo 1990, writ denied) (citing, among other cases, *Harris v. Strawbridge,* 330 S.W.2d 911, 920 (Tex.Civ.App.-Houston 1959, writ ref'd n.r.e.)). The additional requirement of proving ouster or repudiation of the co-tenancy relationship exists because exclusive use and possession of the property for long periods of time is common in a co-tenancy relationship and usually occurs "with the acquiescence of the other co-tenants." *Todd,* 365 S.W.2d at 159. The "real property statutes of limitations as to co-tenants are not designed to run in secrecy and silence"; therefore, the claimant must prove actual or constructive notice of the ouster, and the clear, unequivocal and unmistakable repudiation of the common title. *Id.* at 160; *Glover,* 187 S.W.3d at 215.

■ A party may demonstrate notice of the repudiation of the co-tenancy relationship by circumstances, and the jury may infer such facts "from long continued possession of the land under claim of ownership and non-assertion of claim by the owners." *Todd,* 365 S.W.2d at 159; *see also Glover,* 187 S.W.3d at 215 (noting that claimant can establish constructive notice by (1) long-continued possession or (2) change in use or character of possession).

The law and the evidence that we next discuss support submission of the challenged instruction. We therefore hold that the trial court did not abuse its discretion in instructing the jury on the requirement of ouster.

### D. Evidentiary challenges

#### 1. Legal sufficiency

■ With respect to the legal sufficiency of the evidence, the jury reasonably could credit the testimony of the various Venters heirs, who explained that Snap had a friendly and neighborly relationship with Dyer, had allowed Dyer to graze his cattle on and collect hay from the property, and had his assistance in making repairs to the fence and other chores even before Dyer had any ownership interest in the property. The heirs described their regular visits to the property, noting that the property's use generally remained the same from before Snap's death through to the present. With Snap's and the other co-tenant's permission, and then through his own rights as a co-tenant, Dyer used the property in a manner consistent with those rights. *See Radford v. Garza,* 586 S.W.2d 656, 662 (Tex.Civ.App.-Corpus Christi 1979, no writ) (determining that owner and claimant who entered property with owner's consent created landlord-tenant relationship even though claimant was not required to pay rent, so that owner was justified in assuming claimant's use of premises was permissive and in recognition of his title; manifestation of adverse possession under circumstances "must be so notorious that it is not susceptible of explanation consistent with the existence of the landlord-tenant relationship"); *Cleveland v. Hensley,* 548 S.W.2d 473, 475 (Tex.Civ.App.-Texarkana 1977, no writ) (declaring that once landlord-tenant relationship is established, tenant's possession will not be considered adverse to owner unless tenant (1) repudiates relationship and then asserts claim of right adverse to owner, and (2) gives notice of such repudiation and adverse claim to owner). The heirs, as well as Cotton, testified that they did not see any "no trespassing" signs posted on the property, entered the property without difficulty, and never had heard Dyer prohibit them from coming onto the property or claim it for his exclusive use. Snap's daughters both testified that, after their father's death, Dyer asked

if they would convey their property interests to him, a request that is inconsistent with the assertion of an exclusive property right.

The evidence creates a fact issue as to whether Dyer adversely possessed the property, one that the jury was entitled to resolve based on the credibility of the witnesses and the quality and quantum of evidence presented by each side. Because Dyer has not shown that the evidence compels a finding that he adversely possessed the property as a matter of law, we do not disturb the judgment on this ground. *See Dow Chem. Co.*, 46 S.W.3d at 241 (holding that party which attacks legal sufficiency of adverse finding when it had burden of proof on issue must demonstrate that evidence establishes, as matter of law, all vital facts in support of issue); *One Ford Mustang v. State*, 231 S.W.3d 445, 449 (Tex.App.-Waco 2007, no pet.).

### 2. Factual sufficiency

In contending that the jury finding of no adverse possession is against the great weight and preponderance of the evidence, Dyer points to the following evidence:

- Dyer regularly put as many as 75 branded cattle and 25 horses on the property to graze;
- Dyer regularly produced hay on eleven acres on the east side of the property;
- In 1995, Dyer tore down the old fence and built a new, stronger fence around the property;
- Dyer used large machinery on the property to build the gate and handle the hay farming operations;
- Dyer added a locked gate to the county road and two gates opening to his contiguous property;
- Ranch hands, dog trainers, and neighbors who frequently used the land with Dyer's permission testified that they never saw anyone on the proper-

ty other than Dyer, his family, employees, and guests; and

- In 1999, Dyer told a forester hired by Venters heirs that he could not cut timber on the property and showed him his deed to the property.

These facts do not support Dyer's contention. His use of the land for grazing and collecting hay are the same activities for which Snap gave permission to Dyer while they were neighbors. "The rule is well settled that use by express or implied permission or license, no matter how long continued, cannot ripen into an easement by prescription, since user as of right, as distinguished from permissive user, is lacking." *Othen v. Rosier*, 148 Tex. 485, 226 S.W.2d 622, 626 (1950) (internal quotation omitted). Further, Dyer's activities, including his construction of a new fence, are consistent with his rights as a co-tenant. *See Todd*, 365 S.W.2d at 160 ("Any co-tenant has a right to be in the possession of property in which he owns an interest, hence if the acts of the respondents and their predecessors in title are susceptible of explanation consistent with the existence of the common title then such acts cannot be such as to give constructive notice to the co-tenants out of possession."); *Rau v. Christy*, 383 S.W.2d 957, 959 (Tex.Civ. App.-Waco 1964) (replacement of older fence that "wasn't too good a fence" was "inconsistent neither with tenancy nor possession which is presumed in right of common title for the joint benefit of all tenants in common."). Finally, we defer to the jury's reconciliation of the testimony from Dyer's witnesses that no one saw the co-tenants using the property during this period in contrast with the Venters heirs themselves describing their usage. *See Eberle*, 73 S.W.3d at 327. The record, as a whole, shows that the jury's finding of no adverse possession is not

against the great weight and preponderance of the evidence.

## II. Admission of Evidence of Other Litigation and Closing Argument Rulings

Dyer contends that the trial court erred by failing to "take appropriate curative action" when Cotton's counsel asked questions of witnesses concerning and discussed, during closing argument, Dyer's involvement in prior adverse possession lawsuits. Dyer contends that the evidence of other adverse possession lawsuits is not relevant to whether he adversely possessed the property at issue in this case, and its probative value was substantially outweighed by the danger of unfair prejudice, confusion of issues, and misleading the jury. Dyer does not specifically contend that the statements made during closing argument were incurable.

■ The purpose of a motion in limine is to prevent the opposing party from asking questions to elicit or otherwise introducing unfairly prejudicial evidence without first approaching the bench for a formal ruling. *Fort Worth Hotel Ltd. P'ship v. Enserch Corp.*, 977 S.W.2d 746, 757 (Tex.App.-Fort Worth 1998, no pet.) (citing *Hartford Accid. & Indem. Co. v. McCardell*, 369 S.W.2d 331, 335 (Tex. 1963)). When the trial court grants a motion in limine, the opposing party has a duty to comply with the ruling and instruct the witnesses to do so as well. *Onstad v. Wright*, 54 S.W.3d 799, 805 (Tex.App.-Texarkana 2001, pet. denied). When a trial court instructs the jury to disregard violative evidence, we review that evidence to determine whether an instruction to disregard can cure its admission. *Enserch Corp.*, 977 S.W.2d at 757 (citing *Dove v. Dir., State Employees Workers' Comp. Div.*, 857 S.W.2d 577, 580 (Tex.App.-Houston [1st Dist.] 1993, writ denied)).

### A. Testimony about other litigation

■ Dyer contends that Cotton violated the trial court's in limine ruling by questioning five witnesses about Dyer's adverse possession of the other adjacent tract and his involvement in other adverse possession lawsuits. After Dyer's former ranch hand testified that Dyer kept equipment on the Venters property, Cotton asked the ranch hand whether he was aware of a lawsuit regarding the equipment's ownership. The trial court overruled Dyer's objection. Then, when Cotton asked the ranch hand about whether he prepared for this lawsuit by reviewing his testimony from a previous lawsuit, the trial court sustained Dyer's objection on relevancy grounds.

Keith Neumann, a neighbor who testified by deposition, also testified for Dyer in a previous lawsuit. The trial court allowed Neumann's testimony regarding a lawsuit involving a fence line and a dispute with other elderly neighbors, but did not allow any reference to Dyer's adverse possession of the tract on the other side of his property. Dyer also objected when Cotton asked a witness who had done timber assessments on Dyer's property about title disputes on the various tracts Dyer claimed. The trial court allowed Cotton to ask about the timber assessments, but barred him from asking about other lawsuits.

Cotton also questioned the Grimes County Tax Assessor about the properties for which Dyer had sought an agricultural tax exemption. The trial court informed Cotton's counsel that the question was proper, but warned him not to consider it as an open door to ask about the adverse possession suit involving the other property next to Dyer's. When Cotton continued to ask about the taxes Dyer paid and the exemptions for which he applied, the trial court admonished Cotton that his questions bordered on "contaminat[ing the]

jury with the other lawsuit," and if he solicited any testimony from witnesses about the lawsuit, the court "would take very seriously any motions for a mistrial."

Bonnie Armstrong, who provided the title insurance for Cotton's purchase of the Venters property, stated that she knew Dyer had claimed other property under adverse possession in the course of explaining the exceptions she included in the policy. The trial court denied Dyer's request for an instruction to the jury to disregard that testimony, but it instructed Armstrong not to mention any other adverse possession lawsuits involving Dyer. On redirect, Cotton asked the trial court for permission to ask Armstrong about Dyer's other adverse possession claims that might have affected Cotton's claim to the Venters estate. The trial court denied this request.

Dyer asked for an instruction to disregard only once—when Armstrong testified that she knew Dyer had claimed other property under adverse possession. He did not seek an instruction to disregard the other questions about his lawsuits and adverse possession claims for different property. Those questions and the admitted testimony are not so prejudicial that the trial court could not have remedied their harmful effect by an instruction to disregard, and the trial court's denial of his single request, even if in error, did not cause rendition of an improper judgment. *See* TEX.R.APP. P. 44.1. We hold that the trial court did not reversibly err by denying Dyer's requested instruction to disregard.

### B. Closing argument

 Dyer complains of Cotton's references, in closing argument, to: (1) the "fraud" lawsuit over equipment ownership; (2) Bonnie Armstrong's preparation of the title insurance policy for Cotton knowing of Dyer's previous legal problems; and (3) a reference to Keith Neumann's prepara-

tion for his deposition in this case by reviewing his testimony from another lawsuit "involv[ing] elderly people." To preserve for appellate review a complaint of improper jury argument, the complaining party must object when the argument occurs, unless the conduct or comment cannot be rendered harmless by proper instruction. *See Jones v. Rep. Waste Servs. of Tex., Ltd.*, 236 S.W.3d 390, 402 (Tex.App.-Houston [1st Dist.] 2007, pet. denied) (citing *Dow Chem. Co.*, 46 S.W.3d at 241). A jury argument is curable if the trial court can eliminate the argument's harmful effect by instructing the jury to disregard the statement. *Id.* (citing *Otis Elevator Co. v. Wood*, 436 S.W.2d 324, 333 (Tex.1968)). We examine the record to determine whether an instruction to disregard would have sufficiently remedied the harm. *Id.* at 403. Rarely will an improper argument so prejudicially influence the jury such that the trial court cannot cure the error. *Id.* (citing *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex.1979)).

Dyer objected to the references to the other lawsuits, but not until after the jury retired to begin deliberations. The record does not establish that Cotton's closing arguments were incurable so as to warrant a new trial where no objection or request for a limiting instruction was made. Because Dyer did not timely object and request an instruction, we hold that Dyer failed to preserve this contention for review. *See id.;* TEX.R.APP. P. 33.1(a)(1).

### III. Witness Disclosures and Parol Evidence

Dyer contends that the trial court erred by allowing Jack Baker, Dyer's immediate grantor, to testify because (1) Cotton did not properly disclose Baker as a potential witness during discovery, and (2) Baker's testimony regarding his intention to only convey his interest, and not the entire fee

estate, to Dyer violated the parol evidence rule.

### A. Discovery disclosure

Dyer contends that the trial court should have excluded Baker's testimony because, although Cotton listed Baker as a potential witness during discovery, he did not list Baker's location or telephone number and did not accurately supplement this information when he learned it on the first day of trial. We review the trial court's decision to admit a witness's testimony for an abuse of discretion. *Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527–28 (Tex.2000).

A party may request disclosure of the name, address, and telephone number of any person with knowledge of relevant facts. TEX.R. CIV. P. 194.2(e), 194.3(d). Parties have a duty to amend or supplement incomplete or incorrect responses to written discovery. *Id.* 193.5(a). If a party fails to timely make, amend, or supplement a discovery response, that party may not offer the testimony of a witness who was not timely identified unless the trial court finds that (1) good cause exists for the failure to timely make, amend, or supplement the response, or (2) the failure will not unfairly surprise or prejudice the other parties. *Id.* 193.6(a); *Alvarado v. Farah Mfg. Co.,* 830 S.W.2d 911, 913–14 (Tex.1992) (applying former Rule 215.5). This rule is mandatory, and the only permissible sanction for a violation—exclusion of the testimony—is automatic, unless the trial court finds good cause or lack of surprise or prejudice. *Alvarado,* 830 S.W.2d at 914. The party seeking to call the witness bears the burden of establishing good cause or the lack of unfair surprise or prejudice, and although the trial court has discretion in determining whether good cause or lack of unfair surprise exists, the trial court's finding must be supported by the record. TEX.R. CIV. P. 193.6(b); *Alvarado,* 830 S.W.2d at 913–14.

The purpose of Rule 193.6(a) is "to require complete responses to discovery so as to promote responsible assessment of settlement and prevent trial by ambush." *Alvarado,* 830 S.W.2d at 914. Although exclusion of testimony is a harsh consequence for failure to timely disclose or supplement, the good cause exception allows the trial court to excuse the failure to comply in "difficult or impossible circumstances." *Id.; Harris County v. Inter Nos, Ltd.,* 199 S.W.3d 363, 368 (Tex.App.-Houston [1st Dist.] 2006, no pet.). The Texas Supreme Court has previously indicated that a party's good faith efforts at locating a potential witness can support a finding of good cause. *See Clark v. Trailways, Inc.,* 774 S.W.2d 644, 647 (Tex.1989).

In response to Dyer's initial request for disclosure, Cotton listed Baker as a person with knowledge of relevant facts and a potential witness, but reported his address and telephone number as "unknown." Following voir dire, the trial court took up Dyer's objections to Cotton calling Baker as a witness. Cotton's counsel stated that, when he designated Baker as a potential witness, he did not have Baker's address. Counsel recited the various efforts he made to locate Baker, including hiring an investigator to investigate Baker's whereabouts and making inquiries with various residents of Grimes County to find out if they knew Baker and where he lived. Shortly before trial, Cotton's counsel learned from title company owner Armstrong that Baker lived in Grimes County, but that his business took him out of the state for much of the time. In the hearing on Dyer's motion to strike, Baker informed the trial court that he resided in Grimes County but had been absent for most of the last several years doing title work out of the state. Shortly after Dyer filed suit in March 2006, Baker moved to Oklahoma, and had only returned to the area about a month before trial began. The trial court

could also consider that (1) Cotton timely identified Baker as a person with knowledge of relevant facts, (2) Baker's recollection of the circumstances surrounding the conveyance to Dyer would be highly relevant to Dyer's claim, and (3) Dyer, who was a business acquaintance of Baker, was equally able to investigate and ascertain Baker's whereabouts. Thus, the trial court properly could conclude that Cotton made a good-faith effort to locate Baker and that Baker's testimony would not surprise or unfairly prejudice Dyer. On this record, we hold that the trial court did not abuse its discretion in allowing Baker to testify. *See Brunelle v. TXVT, Ltd. P'Ship,* 198 S.W.3d 476, 479–80 (Tex.App.-Dallas 2006, no pet.) (holding trial court did not abuse its discretion in allowing witness to testify where TXVT listed witness on trial witness list, provided information to appellant stating witness had knowledge of events, and appellant spoke to witness on day of incident); *Rutledge v. Staner,* 9 S.W.3d 469, 472 (Tex.App.-Tyler 2000, pet. denied) (concluding that trial court erred when it refused to allow witness to testify for appellant where appellee would not be unfairly surprised or prejudiced because appellee had listed same individual on his potential witness list as person with knowledge of facts).

### B. Violation of parol evidence rule

■■■■ Dyer also contends that the trial court erred in allowing Baker's testimony because his statements regarding conversations with Dyer prior to executing the deed and his intention to only convey his 1/7th interest violate the parol evidence rule. We review de novo parol evidence rulings. *DeClaire v. G & B McIntosh Family Ltd. P'Ship,* 260 S.W.3d 34, 45 (Tex.App.-Houston [1st Dist.] 2008, no pet.). We presume that all prior negotiations and agreements merge into the final deed, and therefore parol evidence is inadmissible to vary, alter, or supplement the terms of an otherwise unambiguous deed except to show (1) the deed was induced by fraud, accident, or mistake, (2) the deed was to become effective only upon certain contingencies, or (3) if the deed is ambiguous, the parties' true intentions differ from those expressed in the agreement. *Id.; Litton v. Hanley,* 823 S.W.2d 428, 430 (Tex.App.-Houston [1st Dist.] 1992, no writ).

■■■ Generally, parol evidence is inadmissible to vary or contradict the terms of an unambiguous deed. Parol evidence is admissible, however, to demonstrate that, through fraud, accident, or mutual mistake, the deed does not reflect the parties' true intentions. *Atlantic Lloyds Ins. Co. of Tex. v. Butler,* 137 S.W.3d 199, 212–13 (Tex.App.-Houston [1st Dist.] 2004, pet. denied). The parol evidence rule thus does not apply as a bar when a party alleges that, by reason of a mutual mistake, the agreement "does not express the real intention of the parties." *Id.* (quoting *Marcuz v. Marcuz,* 857 S.W.2d 623, 627 (Tex.App.-Houston [1st Dist.] 1993, no writ)); *see also Massey v. Massey,* 807 S.W.2d 391, 405 (Tex.App.-Houston [1st Dist.] 1991, writ denied) ("A spouse who is a party to a deed transaction may not introduce parol or extrinsic evidence to contradict the express recitals in the deed without first tendering evidence of fraud, accident, or mistake."). A mutual mistake occurs when the parties to an agreement have a common intention, but the written contract does not reflect that intent. *Marcuz,* 857 S.W.2d at 627.

■■■ To prove mutual mistake, a party must show (1) the parties' true agreement, and (2) that the instrument incorrectly reflects that agreement because of a mutual mistake. *Butler,* 137 S.W.3d at 213. In his amended counter-petition, Cotton pleaded fraud, ambiguity, and mistake, and alleged that Dyer purchased the land from

Baker with knowledge of the co-tenancy relationship. Cotton offered Baker's testimony to establish that the deed purporting to convey the entire fee estate to Dyer was fraudulent or the result of a scrivener's error. Baker testified that, before they finalized the conveyance, he told Dyer that he did not own a full interest in the property and did not intend to convey the entire fee estate. According to Baker's testimony, therefore, the deed did not correctly state Baker's actual interest in the property.

Baker's testimony tends to prove mutual mistake, and therefore, the parol evidence rule does not bar its admission. We hold that the trial court did not err in allowing Baker to testify.

## CONCLUSION

We hold that (1) the trial court did not abuse its discretion in instructing the jury on ouster; (2) legally and factually sufficient evidence supports the jury's finding of no adverse possession; (3) Dyer waived his complaint concerning the admission of evidence of other adverse possession and property dispute lawsuits in which Dyer was involved; and (4) the trial court did not abuse its discretion in allowing Baker to testify. We therefore affirm the judgment of the trial court.