ACCEPTED
01-15-00396-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
12/7/2015 10:21:52 PM
CHRISTOPHER PRINE
CLERK

# CASE NO. 01-15-00396-CV

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
12/7/2015 10:21:52 PM
CHRISTOPHER A. PRINE
Clerk

## IN THE FIRST COURT OF APPEALS
## HOUSTON, TEXAS

### John W. Hankins

### v.

### Sarah T. Harris

## On Appeal from the 333rd Judicial District Court
## of Harris County, Texas
## Trial Court Case No. 2014–01360

### APPELLANT'S REPLY BRIEF
### **ORAL ARGUMENT REQUESTED**

**LEYH, PAYNE & MALLIA, PLLC**
Sean M. Reagan
(Lead Counsel)
sreagan@lpmfirm.com
Texas Bar No. 24046689
9545 Katy Freeway,
Suite 200
Houston, Texas 77024
(713) 785–0881
(713) 784–0338 (Fax)

**HUGHES ELLZEY, LLP**
Jarrett L. Ellzey
jarrett@hughesellzey.com
Texas Bar No. 24040864
W. Craft Hughes
craft@hughesellzey.com
Texas Bar No. 24046123
Galleria Tower I
2700 Post Oak Blvd.,
Suite 1120
Houston, Texas 77056
(713) 554–2377
(888) 995–3335 (Fax)

**WILSON, CRIBBS & GOREN, P.C.**
Brian B. Kilpatrick
Texas Bar No. 24074533
bkilpatrick@wcglaw.net
H. Fred Cook
Texas Bar No. 02742500
hfcook@wcglaw.net
2500 Fannin Street
Houston, Texas 77002
(713) 222–9000
(713) 229–8824 (Fax)

*Counsel for Appellant, John W. Hankins*

# Table of Contents

Table of Contents ............................................................................ 2

Index of Authorities ........................................................................ 5

Reply Brief....................................................................................... 8

    A.     Reply Point No. 1: Sarah's brief contains numerous representations that are either designed to construe matters out of context or outright misrepresentations. ............ 8

    B.     Reply Point No. 2: Sarah's claim that the entirety of the Property was protected from a forced sale because it was a "family" homestead has a fatal flaw: Norma and Roy were no longer a "family" after their divorce...................... 11

    C.     Reply Point No. 3: Hankins' judgment lien and execution lien validly attached to Norma's interest in the Property after she divorced Roy and abandoned the Property. Sarah's claim that Hankins cited no evidence to demonstrate that Norma abandoned the Property is flat out wrong. .................................................................13

    D.     Reply Point No. 4: Sarah's claim that Roy's undivided one–half interest in the Property protected the entire Property from a forced sale would grant him a greater right, title, or interest in the Property than what he actually owned, which is contrary to Texas law.........................16

    E.     Reply Point No. 5: Sarah's bold claim the Austin court of appeals' decision in *Synnott* "is the law" is wrong. ...............16

    F.     Reply Point No. 6: Sarah's claim that a party's homestead protection "would be all but ephemeral" if a creditor could force a partition ignores well–established Texas law that permits the partition of homestead property. ........................................................... 18

G.     Reply Point No. 7: If the automatic stay created by Roy's bankruptcy filing results in the execution sale being voided, the Court should restore the parties to the status quo, including reviving Hankins' liens, if necessary. Sarah's arguments in opposition are unavailing. ..............................................................19

H.     Reply Point No. 8: Sarah's claim that Hankins acquired nothing at the execution sale because Norma allegedly owned no interest in the Property at the time lacks merit and would turn well–established Texas law in its head. ...................................................................... 23

I.     Reply Point No. 9: Sarah's continued insistence that her parents' Marriage Settlement Agreement constituted an executory contract vesting Roy with equitable title on the day of the divorce is puzzling. ................ 25

J.     Reply Point No. 10: Sarah's claim that Hankins was required to execute on his lien within four years misconstrues and misrepresents the plain text of Section 16.035 of the Civil Practice & Remedies Code. ............28

K.     Reply Point No. 11: Sarah's claim that she wasn't required to prove repudiation and ouster of her co–tenant is incredible. This is the very basis on which Sarah based on her motion for summary judgment.................30

L.     Reply Point No. 12: Sarah claims she repudiated Hankins' title by accepting a deed from Roy that purported to convey the fee simple estate to her. Despite Hankins directing her to binding authority from this Court holding otherwise, Sarah ignores this adverse authority.................................................................31

M.     Reply Point No. 13: Sarah's claim that she can rely on her parents' alleged repudiation of Hankins' title when they were not Hankins' co–tenants lacks merit. ...................... 33

N.      Reply Point No. 14: Sarah wants to eat her cake and have it too. On one hand, Sarah claims she is a stranger to this dispute. On the other hand, Sarah claims that the dispute was between Hankins and the Harris family, including her. Sarah cannot have it both ways. ............ 34

O.      Reply Point No. 15: Despite Sarah's claim to the contrary, Sarah must establish title from the sovereign to prevail on her three–year adverse possession claim. ...............

P.      Reply Point No. 16: Sarah's claim that there is "voluminous evidence" to support her adverse possession claim misses the mark. The evidence cited by Sarah to support her claim for adverse possession is nothing more than actions taken by the Harris family that is consistent with a co–tenancy ...................................... 37

Conclusion and Prayer ........................................................... 39

Certificate of Service ............................................................. 40

Certificate of Compliance ...................................................... 41

# Index of Authorities

## <u>Cases</u>

*Almanza v. Salas,*
    No. 14–12–01114–CV, 2014 WL 554807
    (Tex. App.—Houston [14th Dist.] Feb. 11, 2014, no pet.)................... 18

*Borden v. McRae,*
    46 Tex. 396 (1877).............................................................................21

*BP Am. Prod. Co. v. Marshall,*
    342 S.W.3d 59 (Tex. 2011) ............................................................... 33

*Cleveland v. Milner,*
    170 S.W.2d 472 (Tex. 1943) ..............................................................19

*Drake Interiors, LLC v. Thomas,*
    433 S.W.3d 841
    (Tex. App.—Houston [14th Dist.] 2014, pet. denied)........................17

*Dyer v. Cotton,*
    333 S.W.3d 703 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ....... 32

*Fairfield Fin. Group, Inc. v. Synnott,*
    300 S.W.3d 316 (Tex. App.—Austin 2009, no pet.)................ 13, 16–18

*Flag–Redfern Oil Co. v. Humble Exploration Co.,*
    744 S.W.2d 6 (Tex. 1987) ................................................................. 27

*Gordon v. West Houston Trees, Ltd.,*
    352 S.W.3d 32
    (Tex. App.—Houston [1st Dist.] 2011, no pet.) ........................... 21–23

*Grant v. Clouser,*
    287 S.W.3d 914
    (Tex. App.—Houston [14th Dist.] 2009, no pet.)........................ 18–19

*Humphrey v. C.G. Jung Educ. Ctr. of Houston,*
    624 F.2d 637 (5th Cir. 1980)............................................................ 36

*Laster v. First Huntsville Props. Co.*,
　　826 S.W.2d 125 (Tex. 1991)...................................................... 12, 14

*Morton v. Nguyen*,
　　412 S.W.3d 506 (Tex. 2013)...................................................... 25, 27

*Patterson v. First Nat'l Bank of Lake Jackson*,
　　921 S.W.2d 240
　　(Tex. App.—Houston [14th Dist.] 1996, no writ) ...............................16

*Sadler v. Duvall*,
　　815 S.W.2d 285 (Tex. App. Texarkana 1991, writ denied) ..................31

*Salomon v. Lesay*,
　　369 S.W.3d 540
　　(Tex. App.—Houston [1st Dist.] 2012, no pet. ........................11–13, 17

*Sayers v. Pyland*,
　　161 S.W.2d 769 (Tex. 1942)..................................................................16

*Smith v. Davis*,
　　462 S.W.3d 604 (Tex. App.—Tyler 2015, pet. denied)....................... 26

*Taylor v. Mosty Bros. Nursery, Inc.*,
　　777 S.W.2d 568 (Tex. App.—San Antonio 1989, no writ) ...................15

*Texas Employer's Ins. Ass'n v. Engelke*,
　　790 S.W.2d 93
　　(Tex. App.—Houston [1st Dist.] 1990, no writ)..................................21

*Thedford v. Union Oil Co.*,
　　3 S.W.3d 609 (Tex. App.—Dallas 1999, pet. denied) .........................31

*Todd v. Bruner*,
　　365 S.W.2d 155 (Tex. 1963) ................................................. 33, 34, 37

*Wierzchula v. Wierzchula*,
　　623 S.W.2d 730
　　 (Tex. Civ. App.—Houston [1st Dist.] 1981, no writ) ..........................12

*Wilcox v. Marriott,*
    103 S.W.3d 469
    (Tex. App.—San Antonio 2003, pet. denied) ................................14, 22

## Statutes

TEX. CIV. PRAC. & REM. CODE § 16.021........................................................ 36

TEX. CIV. PRAC. & REM. CODE § 16.023 ...................................................... 33

TEX. CIV. PRAC. & REM. CODE § 16.024 ...................................................... 36

TEX. CIV. PRAC. & REM. CODE § 16.035 ........................................... 28–29

TEX. CONST. art. XVI, § 50 .......................................................................11–14

TEX. PROP. CODE § 41.002 .................................................................. 11, 12, 14

TEX. PROP. CODE § 52.006........................................................................... 29

TEX. R. APP. P. 38.1 ....................................................................................... 9

TEX. R. CIV. P. 680 ........................................................................................ 9

## Secondary Sources

TEX. PATTERN JURY CHARGES–NEGLIGENCE at §1.3(6) (2012) ......................38

West, *The Texas Three Year Statute of Limitation,*
    19 TEXAS L. REV. 375 (1941)............................................................. 36

## Reply Brief

### A. Reply Point No. 1: Sarah's brief contains numerous representations that are either designed to construe matters out of context or outright misrepresentations.

Sarah's brief is rife with misrepresentations of the record and the law, including misleading representations designed to construe matters out of context.

For example, in her introduction, Sarah claims that Hankins' interest in the Property arose from an execution sale that violated both federal and state court orders. Resp. Br. at 1. Similarly, Sarah claims that Hankins is not challenging the validity of the temporary restraining order on appeal. *Id.* at 5, n. 4. These claims are irrelevant, taken out of context, and misrepresentations of the record.

These claims are irrelevant because Sarah did not move for summary judgment on either the temporary restraining order issued by the state court or the injunction issued by the bankruptcy court. (1 Supp. CR at 179–201; *see also, id.* at 186, n. 5) ("At this time, Sarah is not moving for summary judgment on the grounds that the [execution] sale violated the TRO.")). Thus, neither injunction can serve as a basis for affirming the trial court's summary judgment.

Regardless, there is no evidence that the temporary restraining order issued by the state court was valid because the order did not, *inter alia*, state the hour of issuance, define the injury, state why any harm or injury would be irreparable, or state why the order was granted without notice, as required by Texas Rule of Civil Procedure 680. (*Compare* 1 Supp. CR at 474–76 *with* TEX. R. CIV. P. 680.) The court did set a bond in the amount of $50,000. (*Id.* at 476). But Norma and Roy never paid the bond, and thus, the clerk never issued a writ. (2 Supp. CR at 876). These facts were not disputed by Sarah. *See* TEX. R. APP. P. 38.1 ("In a civil case, the court will accept as true the facts stated unless another party contradicts them."). Thus, there is no evidence that the temporary restraining order was valid. Instead, the evidence establishes that the temporary restraining order was void because it failed to comply with Texas Rule of Civil Procedure 680.

Furthermore, there is no evidence that the injunction issued by the bankruptcy court was issued before the execution sale. Rather, the record shows the execution sale occurred at 10:30 a.m. on September 2, 1980, well before the bankruptcy court issued its injunction later that day at 2:26 p.m. (1 Supp. CR at 286, ¶ 32) (attached by Sarah as summary judgment evidence). So, Hankins logically could not have violated the injunction

9

issued by the bankruptcy court when he executed on Norma's interest in the Property when the injunction did not issue until about four hours later.

Sarah also claims that "Hankins cited no evidence … to demonstrate that Norma abandoned the Property as a matter of law, or, for that matter, that she acquired another homestead elsewhere." Resp. Br. at 19. This representation is misleading for two reasons. First, Hankins—as the non–movant—did not have to establish that Norma abandoned the Property as a matter of law. Second, Hankins did cite evidence of abandonment in his opening brief—Norma's deposition testimony. Hankins Br. at 5–6. Specifically, Hankins quoted Norma's deposition testimony, in which she testified that she had "no intention of moving back" to the Property. *Id.* at 5 (citing 2 Supp. CR at 1113–15).

In an effort to bolster her adverse possession claim and show repudiation of Hankins' interest in the Property, Sarah also claims that Matthew Hoffman, an attorney, represented her, along with her parents in dealing with Hankins' demands in 1984 and 1990. Resp. Br. at 9. But Hoffman merely averred that he represented Roy with respect to the Property. (1 Supp. CR at 405, ¶ 3). As discussed in more detail below, there is no evidence that Hoffman ever represented Sarah. Her claim to the contrary belies the record.

These are a few examples of Sarah's misrepresentations. Hankins will address others in more detail below, as well as Sarah's failure to address binding authority that is adverse to her claims.

**B.  Reply Point No. 2: Sarah's claim that the entirety of the Property was protected from a forced sale because it was a "family" homestead has a fatal flaw: Norma and Roy were no longer a "family" after their divorce.**

In her brief, Sarah repeatedly reasserts that Roy's undivided homestead interest protected the entire property because "the constitutional homestead exemption is given to the family, not to either spouse individually." Resp. Br. at 20–27 (quoting *Salomon v. Lesay*, 369 S.W.3d 540, 555 (Tex. App.—Houston [1st Dist.] 2012, no pet.).  Sarah also claims that "so long as real property is a family homestead by virtue of one spouse's intention and use, that property is protected by the homestead exemption, unless abandonment is pleaded and proved." *Id.* (quoting *Salomon*, 369 S.W.3d at 355). Sarah's claims have a fundamental flaw: Roy and Norma were no longer a "family" at the time the levy was issued or at the time of the execution sale—they were divorced. (1 Supp. CR at 378–82).

The constitutional homestead protection is given to either a "family" or a "single adult person." Tex. Const. art. XVI, § 50; Tex. Prop. Code § 41.002(a). This Court has held that it is impossible for a homestead to be both a "family" homestead and a "single adult person" homestead. *Salomon*

11

*v. Lesay*, 369 S.W.3d 540, 555–56 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ("[I]f Malena has a homestead interest in the property, as the jury found, then that property must be a family homestead, because as a married person with a living spouse, she cannot have the only other kind of homestead, that of a single adult person.") (citing TEX. CONST. art. XVI, § 50).

In this case, Roy and Norma divorced. As a result of the divorce, they became co–tenants, each with an undivided one–half interest in the Property. *See Laster v. First Huntsville Props. Co.*, 826 S.W.2d 125, 131 (Tex. 1991). Again, it is impossible for the same property to be a "family" homestead and a "single adult person" homestead—it must be one or the other. *Salomon*, 369 S.W.3d at 555–56.[1] Therefore, Roy's and Norma's respective interest in the Property could only be protected as their separate "single adult person" homestead because Roy and Norma were no longer a "family." TEX. CONST. art. XVI, § 50; TEX. PROP. CODE § 41.002(a). Thus, Sarah's repeated claim that the Property was protected from Hankins' forced sale because it was a family homestead lacks merit. TEX. CONST. art. XVI, § 50; *see Salomon*, 369 S.W.3d at 555–56.

---

[1] A divorce does not automatically destroy the homestead protection of a property. *See, e.g., Wierzchula v. Wierzchula,* 623 S.W.2d 730, 732 (Tex. Civ. App.—Houston [1st Dist.] 1981, no writ). Thus, it appears that whatever family homestead Roy and Norma possessed would have converted into separate single adult person homesteads upon their divorce if not for Norma's abandonment.

This conclusion also dictates that the *Synnott* case relied upon by Sarah was wrongly decided. In Synnott, upon the ex–husband's abandonment of his homestead interest and his divorce, the property could no longer be a "family homestead." TEX. CONST. art. XVI, § 50; *see Salomon*, 369 S.W.3d at 555–56. Instead, the property in *Synnott* was a co–tenancy upon the parties' divorce, which converted whatever homestead interest the parties may have had in the property from a family homestead to a single adult person homestead. *Id.* Thus, the Austin Court of Appeals got it wrong when it held that "the property remained at all relevant times protected by [ex–wife's] undivided homestead interest in the property." *Fairfield Fin. Group, Inc. v. Synnott*, 300 S.W.3d 316, 321 (Tex. App.—Austin 2009, no pet.). The non–abandoning ex–spouse's homestead rights only protected her undivided interest in the property; not the entirety of the property.

**C.** **Reply Point No. 3: Hankins' judgment lien and execution lien validly attached to Norma's interest in the Property after she divorced Roy and abandoned the Property. Sarah's claim that Hankins cited no evidence to demonstrate that Norma abandoned the Property is flat out wrong.**

Sarah claims that Hankins' judgment and execution liens could not attach to Norma's interest in the Property after her divorce from Roy because the Property was Norma's homestead. *See* Resp. Br. at 25, n. 12 ("Hankins could not foreclose on the $50,000 in proceeds from Norma's

sale of her homestead interest to Roy. \*\*\* "[B]ecause the Property was originally her homestead, Norma's conveyance of the Property to Roy was free of any alleged lien by Hankins."). But this alleged homestead protection can be lost through abandonment. *See Florey v. Estate of McConnell*, 212 S.W.3d 439, 443–44 (Tex. App.—Austin 2006, pet. denied). Thus, if the judgment debtor abandons the homestead property, the judgment lien will attach to her interest in the property. *See Wilcox v. Marriott*, 103 S.W.3d 469, 473 (Tex. App.—San Antonio 2003, pet. denied). Just because a property was once homestead doesn't mean that it will remain homestead *ad infinitum*.

Here, Norma and Roy were co–tenants following their divorce in June 1980. *See Laster*, 826 S.W.2d at 131 (When more than one person owns an interest in homestead property, there is a co–tenancy.). Under Texas homestead law, they each could only claim the homestead protection for their respective interest in the Property as a "single adult person." TEX. CONST. art. XVI, § 50; TEX. PROP. CODE § 41.002(a). But Norma lost the homestead protection for her undivided one–half interest in the Property when she abandoned the Property during her divorce proceeding. At the time the divorce was filed, Norma was living in Brownsville and testified that she had "no intention of moving back" to the Property. (2 Supp. CR at

1113–15). Norma thus abandoned any homestead rights she may have had in the Property, and this abandonment was effective on the date her divorce was granted.

Sarah disagrees. Resp. Br. at 17–19. Sarah claims that "Hankins cited no evidence … to demonstrate that Norma abandoned the Property as a matter of law, or, for that matter, that she acquired another homestead elsewhere." *Id.* at 19. Sarah is wrong. As set forth above, Hankins—as the non–movant—had no obligation to establish that Norma abandoned the Property as a matter of law. But more important, Hankins **did cite evidence** of Norma's abandonment—Norma's deposition testimony. Hankins Br. at 5–6. Specifically, Hankins quoted Norma's deposition testimony in his opening brief, in which she testified that she had "no intention of moving back" to the Property. *Id.* at 5 (citing 2 Supp. CR at 1113–15). This is sufficient to establish abandonment, or, at the very least, raise a genuine issue of material fact on the issue of Norma's abandonment. *See Taylor v. Mosty Bros. Nursery, Inc.*, 777 S.W.2d 568, 569 (Tex. App.—San Antonio 1989, no writ) (To show abandonment of one's homestead interest, the party claiming abandonment must show that the homestead claimant moved with the intention of not returning to the property.).

**D.  Reply Point No. 4: Sarah's claim that Roy's undivided one–half interest in the Property protected the entire Property from a forced sale would grant him a greater right, title, or interest in the Property than what he actually owned, which is contrary to Texas law.**

Sarah also continues to maintain that Roy's undivided one–half interest in the Property protected the entire Property from a forced sale. Resp. Br. at 22. But Sarah ignores Texas law that dictates that a claimant's homestead interest can extend only to the interest in the property that he owns. *See Patterson v. First Nat'l Bank of Lake Jackson*, 921 S.W.2d 240, 246 (Tex. App.—Houston [14th Dist.] 1996, no writ) (stating that an ex–wife's family homestead extends only to her proportional interest in the residence). Thus, it is well–established that one's homestead right in property can never rise any higher than the right, title, or interest the claimant owns in the property. *Sayers v. Pyland*, 161 S.W.2d 769, 773 (Tex. 1942). This means Roy's "single adult person" homestead rights in his undivided one–half interest of the Property cannot operate to protect the entire Property from a forced sale when the sale is limited to his ex–wife's separate and abandoned undivided one–half interest in the Property.

**E.  Reply Point No. 5: Sarah's bold claim the Austin court of appeals' decision in *Synnott* "is the law" is wrong.**

Sarah next boldly claims that *Synnott* "is the law." Resp. Br. at 26. Sarah is wrong. The *Synnott* case was decided by the Austin Court of

16

Appeals—not the Supreme Court of Texas. The *Synnott* case wasn't even appealed to the Supreme Court of Texas. This Court cited *Synnott* in its *Salomon* decision, but that was dicta, as *Salomon* dealt with a married couple asserting the constitutional homestead protection, as opposed to a single adult person such as Roy. *Salomon*, 369 S.W.3d at 555–56. The *Salomon* case did not address the issue presented here: whether an ex–spouse's abandonment of her homestead interest can subject her property to a forced sale.

Sarah also claims that the Fourteenth Court of Appeals recognized that *Synnott* "is the law" in its *Drake Interiors, LLC v. Thomas* opinion. Resp. Br. at 27. But the *Drake Interiors* opinion only cited *Synnott* in passing and for the general proposition that "[i]f the property is exempt because it is the debtor's homestead, the lien will attach only when the property has lost its homestead character." *Drake Interiors, LLC v. Thomas*, 433 S.W.3d 841, 847 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). This is a far cry from the Fourteenth Court of Appeals following *Synnott* and holding that an ex–spouse's abandonment of her homestead interest does not subject her property to a forced sale.

Sarah further cites a memorandum opinion issued by the Fourteenth Court of Appeals as support her bold claim that *Synnott* "is the law." Resp.

Br. at 27. But this opinion again only cites *Synnott* in passing and for general propositions, such as "[p]roperty may lose its homestead character only by the claimant's death, abandonment, or alienation," and "judgment liens, even if properly abstracted, cannot attach to a homestead while that property remains a homestead." *See Almanza v. Salas*, No. 14–12–01114–CV, 2014 WL 554807 at * 3–4 (Tex. App.—Houston [14th Dist.] Feb. 11, 2014, no pet.). In any event, *Almanza* was decided on a critical fact not present here: the undisputed evidence showed that the ex–wife relinquished any claim she had to the homestead pursuant to her divorce decree by immediately conveying the property to her ex–husband. *Id*. at *5. Here, the evidence is very much disputed regarding whether Norma conveyed her interest in the Property to Roy pursuant to their divorce.

**F.    Reply Point No. 6: Sarah's claim that a party's homestead protection "would be all but ephemeral" if a creditor could force a partition ignores well–established Texas law that permits the partition of homestead property.**

Sarah next claims the homestead protection "would be all but ephemeral" if a creditor, such as Hankins could force a partition of the Property. This claim can be easily dismissed. Texas courts have long held that homestead rights attaching to property interests held by a co–tenant are subordinate to another co–tenant's right to partition. *Grant v. Clouser*,

18

287 S.W.3d 914, 920 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Cleveland v. Milner*, 170 S.W.2d 472, 476 (Tex. 1943)). Specifically, one co–tenant cannot rely upon a homestead right to trump the partition right of a co–tenant who acquired the interest from a prior co–tenant. *Grant*, 287 S.W.3d at 921 (citing *Cleveland*, 170 S.W.2d at 473). Thus, Roy's homestead right in his undivided one–half interest of the Property is subordinate to Hankins' right to compel partition. *Id.*

**G.  Reply Point No. 7: If the automatic stay created by Roy's bankruptcy filing results in the execution sale being voided, the Court should restore the parties to the status quo, including reviving Hankins' liens, if necessary. Sarah's arguments in opposition are unavailing.**

If the execution sale is void because of the automatic stay created by Roy's bankruptcy filing (which Hankins denies), the sale can be set aside and the parties should be restored to the status quo, which would include reviving Hankins' liens. There is no evidence that Roy's bankruptcy discharge invalidated Hankins' judgment lien or his execution lien on Norma's undivided one–half interest in the Property. Nor is there any evidence that Roy's bankruptcy discharge invalidated Hankins levy on the Property. Thus, Hankins asserts that even if the automatic stay applied to void the execution sale (which Hankins denies), the parties should be

returned to the status quo, with Hankins' liens revived. Sarah disagrees for four reasons, none of which have any merit.

First, Sarah claims that Hankins ignores the release he signed in March 1981, with the point being that the release would bar any attempt by Hankins to restore the status quo. Resp. Br. at 34. Sarah is wrong—Hankins didn't ignore the release; he expressly addressed the release in his opening brief. *See* Hankins Br. at 36, n. 8. As set forth in Hankins' opening brief, Sarah expressly didn't move for summary judgment on the release. (1 Supp. CR at 189, n.6). If Sarah wanted to enforce the release she should have moved for summary judgment on the release. But she did not. So, the release cannot serve as a ground for affirming the summary judgment.

Ironically, it is Sarah who ignores Hankins' assertion that the release may be invalid. Specifically, Hankins asserts that it is undisputed that the release was executed on March 3, 1981, more than two months ***before*** Roy's received his discharge from the bankruptcy court. *See* Hankins Br. at 36, n. 8 (citing 1 Supp. CR at 234–35; 412). There is no evidence in the record that indicates one way or the other whether the money paid to Hankins in exchange for the purported release was property of Roy's bankruptcy estate. Nor is there any evidence the bankruptcy trustee approved the settlement. Under Sarah's logic, the release is void because it

violated the automatic bankruptcy stay. So, if the Court were inclined to void the execution sale and restore the status quo, it should set aside the release as well, revive Hankins' liens, and place the parties back at square one.

Second, Sarah claims it is too late to restore the status quo because Hankins' judgment lien only existed for 10 years, his writ of execution extended the life of the judgment for ten years from the issuance of the writ, and the deadline for reviving a dormant judgment has expired. Resp. Br. at 34–35. But Sarah ignores the most critical point of Hankins' argument: under settled Texas law, an execution lien—created by a valid levy, not an abstract of judgment[2]—is effective from the time of the levy and continues in effect until it is lost or abandoned, or in some way ceases to have vitality and effect. *Texas Employer's Ins. Ass'n v. Engelke*, 790 S.W.2d 93, 95 (Tex. App.—Houston [1st Dist.] 1990, no writ) (citing *Borden v. McRae*, 46 Tex. 396, 400 (1877)). Hankins' execution lien has not been lost or abandoned, nor has it in any way ceased to have vitality and effect. Instead, the levy and the resulting execution lien remain in effect. Sarah ignores this argument in her brief and fails to address this binding authority.

---

[2] *See Gordon v. West Houston Trees, Ltd.*, 352 S.W.3d 32, 39 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (an execution lien is created by a valid levy).

Third, Sarah claims restoring the parties to the status quo is impossible. Resp. Br. at 35. The basis of Sarah's claim is that she is a "stranger" to the transaction, *i.e.*, the litigation and judgment. *Id.* But again Sarah ignores a fundamental premise: it is axiomatic that if a judgment lien properly attaches to real property, a subsequent purchaser, such as Sarah, purchases the property subject to the lien. *See Gordon*, 352 S.W.3d at 38. So, Sarah acquired whatever interest Roy had in the Property, subject to Hankins' lien. Encumbrances on real property do not disappear merely because the obligor conveys the property.

Finally, Sarah claims that Hankins' request to restore the status quo if the execution sale were found to be void ignores her claim that Hankins' judgment lien allegedly cannot be revived because it could never attach to homestead property. This is merely a rehashing of Sarah's earlier claims. Again, Norma's undivided one–half interest in the Property lost its homestead protection once Norma divorced Roy and abandoned the Property. *See Wilcox v. Marriott*, 103 S.W.3d 469, 473 (Tex. App.—San Antonio 2003, pet. denied) (if the judgment debtor abandons the homestead property, the judgment lien attaches to the property.). Hankins' lien attached to Norma's interest once she abandoned the Property and divorced Roy.

**H. Reply Point No. 8: Sarah's claim that Hankins acquired nothing at the execution sale because Norma allegedly owned no interest in the Property at the time lacks merit and would turn well–established Texas law in its head.**

Sarah next claims that her summary judgment should be affirmed because Norma owned no interest in the Property at the time of the August 6, 1980 levy and September 2, 1980 execution sale. Resp. Br. at 36. Instead, Sarah claims that Roy owned full equitable and legal title. Sarah is wrong.

As an initial matter, it doesn't matter what Roy owned on either August 6, 1980 or September 2, 1980. Even if he owned "full equitable and legal title," as Sarah claims, he acquired such title subject to Hankins' liens because those liens were first in time. *See Gordon*, 352 S.W.3d at 38. Norma could not wipe out Hankins judgment and execution liens by merely conveying the Property after she had abandoned it as her homestead.

Regardless, Sarah continues to insist that her parents' divorce decree and marriage settlement agreement conveyed any interest Norma may have had in the Property to Roy less than three months before the execution sale. Resp. Br. at 37. In support of this insistence, Sarah claims Roy had full equitable title to the Property as a result of the divorce because her parents intended to effect an immediate transfer of Norma's interest in the Property to Roy. *Id.* Sarah discounts Hankins' assertion that the Marriage Settlement

23

Agreement indicated a future, or prospective, intent to convey and assign Norma's interest in the Property rather than a present intention, as evidenced by the Agreement's use of phrases indicating future acts such as "shall be," and "agrees to pay." In support her claim, Sarah urges the Court to apply general principles of contract interpretation, and then urges the Court to disregard the cases cited by Hankins that applied general principles of contract interpretation because those cases didn't involve a marriage settlement agreement or a divorce decree. Resp. Br. at 40–42; *id.* at 42, n. 42. Sarah's argument is puzzling: if general contract interpretation principles apply, then the cases cited by Hankins that applied general contract interpretation principles to similar language are thus good authority.

Sarah also incorrectly fixates on the claim that the Marriage Settlement Agreement was only contingent on court approval to support her argument the Agreement evidenced a present intent to convey Norma's interest in the Property to Roy. Resp. Br. at 41. Sarah's claim flies in the face of the evidence in the record. For starters, Roy admitted in his deposition—after the divorce was finalized—that (1) Norma's execution of a deed conveying her interest in the Property to Roy was "in process," and (2) Norma probably would not convey her interest to him until she had the

24

$50,000 purchase price "in hand." (2 Supp. CR at 1185). Roy's deposition testimony does not read like a man who believed he had already acquired "full equitable and legal title" the month before.[3] Roy didn't acquire Norma's undivided one–half interest in the Property through the Divorce Decree and Marriage Settlement Agreement: he acquired whatever interest Norma may have had through the Special Warranty Deed and Deed of Trust he and Norma executed in September 1980.

I. **Reply Point No. 9: Sarah's continued insistence that her parents' Marriage Settlement Agreement constituted an executory contract vesting Roy with equitable title on the day of the divorce is puzzling.**

Next, Sarah continues to make the puzzling argument that the Marriage Settlement Agreement was an executory contract that vested Roy with equitable title on the date the divorce decree was signed. Resp. Br. at 43–44.

As set forth in Hankins' opening brief, an executory contract for the sale of real estate contemplates that the purchaser will complete performance in the future, that is, finishing making payments *before* title to the property passes. *See Morton v. Nguyen*, 412 S.W.3d 506, 509–10 (Tex. 2013) (emphasis added) ("A contract for deed, unlike a typical secured

---

[3] Norma's and Roy's attorney, Matthew Hoffman, wrote Hankins in 1984—four years after the divorce—and stated that Norma "transferred her undivided fifty percent (50%) interest in the Homestead Property to Roy Harris by Special Warranty Deed, pursuant to the above–mentioned June 20, 1980 Divorce Decree." (1 Supp. CR at 410).

25

transaction involving a deed of trust, is a financing arrangement that allows the seller to maintain title to the property until the buyer has paid for the property in full.)"; *see also, Smith v. Davis*, 462 S.W.3d 604, 609 (Tex. App.—Tyler 2015, pet. denied) (unlike a traditional mortgage, an executory contract allows the seller to retain title to the property until the purchaser had paid for the property in full). Sarah failed to address this argument and authority in her brief.

Regardless, the Marriage Settlement Agreement in this case is not an executory contract. Under the Agreement, the transfer of Norma's title to Roy was not contingent on Roy paying the entire purchase price. (1 Supp. CR at 387–88). Instead, Norma and Roy agreed that "title to the house shall be transferred" to Roy, and more important, they agreed that "[i]n return for the disposition of this asset to [Roy], [Roy] agrees to pay [Norma] the sum of ... $50,000 *** As evidence of this obligation, [Roy] agrees to execute to [Norma] a promissory note in the principal sum of Fifty Thousand Dollars ($50,000) ***." (*Id.*; *see* 2 Supp. CR at 1132) (Roy gave his deposition a month after the divorce was final and testified that the deed of Norma's interest to him was "in the process"). Thus, the Marriage Settlement Agreement was not an executory contract because Norma and Roy didn't contemplate a *future* transfer of title contingent on the payment

26

of the full purchase price. (*Id.*). Thus, unlike a typical executory contract, where title is transferred in the future upon the full payment of the purchase price, Roy could obtain Norma's legal title under the Marriage Settlement Agreement *before* paying the purchase price. Sarah ignores this argument in her brief.

Hankins also asserted in his opening brief that Sarah's claim that the Divorce Decree and Marriage Settlement Agreement constitute an executory contract is puzzling in light of the deed of trust executed by Roy. In an executory contract, a purchaser who goes into possession has equitable title, with the seller holding legal title. *See Johnson v. Wood*, 157 S.W.2d 146, 148 (Tex. 1941); *see also, Morton*, 412 S.W.3d at 509–10. Conversely, in a deed of trust, the seller, *i.e.*, Norma, retains equitable title, while the buyer, Roy, acquires legal title. *Flag–Redfern Oil Co. v. Humble Exploration Co.*, 744 S.W.2d 6, 8 (Tex. 1987). So, Norma didn't convey equitable title to Roy, as would be the case with an executory contract, but instead, she conveyed *legal title* to Roy, subject, of course, to Hankins' lien. Sarah also ignored this argument in her brief.

Finally, Sarah makes one last puzzling and confusing claim as to how Roy acquired equitable title through the Marriage Settlement Agreement. Specifically, Sarah claims that the Marriage Settlement Agreement created

a vendor's lien in favor of Norma to secure Roy's payment for her interest in the Property. Resp. Br. at 44. As a result of the vendor's lien, Sarah claims that Norma "no longer held title to the Property after June 20, 1980." *Id.* This incredible claim begs the question: if Norma didn't hold title to the Property after June 20, 1980, what exactly did she convey on September 1, 1980? In other words, how could Norma have conveyed her interest in the Property to Roy on September 1, 1980 if she hadn't held title to the Property since June 20, 1980? Also, if Norma had a vendor's lien to secure payment, why did Roy give her a deed of trust in September 1980 to secure the very same payment that was evidenced by a promissory note, a promissory note referenced in the Marriage Settlement Agreement? (1 Supp. CR at 146–49) (deed of trust to secure payment of $50,000 promissory note payable to Norma Harris); (*Id.* at 387–88) (Marriage Settlement Agreement provides that Roy agreed to execute to Norma a promissory note in the principal sum of Fifty Thousand Dollars ($50,000)). Sarah fails to address these discrepancies in her brief.

**J.    Reply Point No. 10: Sarah's claim that Hankins was required to execute on his lien within four years misconstrues and misrepresents the plain text of Section 16.035 of the Civil Practice & Remedies Code.**

Sarah next claims that Hankins was required to execute on his lien within four years. Sarah relies on § 16.035 of the Civil Practice & Remedies

28

Code for her claim that "Texas law requires that judgment lien must be foreclosed on within four years." Resp. Br. at 40. Sarah is flat out wrong. Specifically, § 16.035(a) of the Civil Practice & Remedies Code states that "[a] person must bring suit for the recovery of real property under a real property lien or the foreclosure of a real property lien not later than four years after the day the cause of action accrues." TEX. CIV. PRAC. & REM. CODE § 16.035(a). Under § 16.035(g), "real property lien" means: (1) "a superior title retained by a vendor in a deed of conveyance or a purchase money note"; or (2) "a vendor's lien, a mortgage, a deed of trust, a voluntary mechanic's lien, or a voluntary materialman's lien on real estate, securing a note or other written obligation." *Id.* at §16.035(g)(1, 2). Neither definition of "real property lien" applies here. This case involves a judgment lien and an execution lien. A judgment lien—as Sarah points out in her brief—exists for ten years, which can be extended. Resp. Br. at 34 (citing TEX. PROP. CODE § 52.006(a)). Thus, Sarah's claim that § 16.035 of the Civil Practice & Remedies Code only gave Hankins four years to execute on his judgment lien not only misrepresents the plain text of the statute, but it also contradicts other assertions in her briefing on the very same subject. Needless to say, the Court can easily reject Sarah's claim that Hankins cannot executed on his lien because more than four years have passed.

29

**K. Reply Point No. 11: Sarah's claim that she wasn't required to prove repudiation and ouster of her co–tenant is incredible. This is the very basis on which Sarah based on her motion for summary judgment.**

Sarah kicks off adverse possession argument with another puzzling and confusing claim: the Court can "summarily reject" Hankins' claim that Sarah was required to establish ouster because he was never a co–tenant; rather, Sarah and Hankins were "strangers in title." Resp. Br. at 46. This claim makes no sense. It makes no sense because Sarah specifically moved for summary judgment on the basis that if Hankins validly foreclosed on the Property, *i.e.*, he was a co–tenant, she nevertheless adversely possessed the Property. (1 Supp. CR at 195, ¶ 44). More specifically, Sarah stated in her motion for summary judgment that Hankins' acquisition of the Property at the execution sale "would have created a cotenancy in the Property between Mr. Hankins and Roy. Under Texas law, the doctrine of ouster allows one cotenant to adversely possess property from another cotenant." (*Id.* at 197, ¶ 48). Thus, Sarah and Hankins were not strangers in title; they were co–tenants, which required Sarah to establish as a matter of law that she ousted Hankins before she could obtain a summary judgment on her adverse possession claim.

30

Sarah continues her puzzling briefing with the claim that because she and Hankins were strangers in title, all she had to do to establish adverse possession was show that the possession was "of such character as to indicate unmistakably an assertion of a claim of exclusive ownership in the occupant," which "Hankins does not argue that Sarah failed to establish ....." Resp. Br. at 46. Hankins doesn't argue that Sarah failed to establish her adverse possession claim in this manner because Sarah didn't raise this claim in the trial court (1 Supp. CR at 195–99, ¶¶ 44–50). Therefore, this new claim cannot support the summary judgment on appeal.

**L.** **Reply Point No. 12: Sarah claims she repudiated Hankins' title by accepting a deed from Roy that purported to convey the fee simple estate to her. Despite Hankins directing her to binding authority from this Court holding otherwise, Sarah ignores this adverse authority.**

Sarah claims she and her predecessors "clearly and unambiguously repudiated Hankins' interest" because Roy allegedly conveyed the entire Property to Sarah in March 1984. Resp. Br. at 47–48. Thus, Sarah argues that "[t]he March 1984 conveyance clearly and unequivocally repudiated Hankins' purported co–tenancy interest," relying on cases from the Dallas and Texarkana courts of appeals. *Id.* at 48 (citing *Thedford v. Union Oil Co.*, 3 S.W.3d 609, 614 (Tex. App.—Dallas 1999, pet. denied); *Sadler v.*

*Duvall*, 815 S.W.2d 285, 289 (Tex. App. Texarkana 1991, writ denied). Sarah is wrong yet again.

Hankins specifically took this argument head on in his opening brief: that repudiation cannot be established by Sarah accepting a deed purporting to convey to her the fee simple interest in the Property. *See* Hankins Br. at 54. Specifically, Hankins asserted that ***this Court*** recently rejected this very same claim. *Id.* (citing *Dyer v. Cotton*, 333 S.W.3d 703, 711 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (the party claiming adverse possession, who owned a 1/7 undivided interest in the property, could not rely on an erroneous deed conveying the entire fee simple estate to him as evidence of repudiation as to the other co–tenants). Despite Hankins asserting this argument and directing Sarah to binding authority from this Court, Sarah ignores it and fails to address this binding authority that guts her repudiation claim. Without any explanation from Sarah as to why *Dyer* is not controlling, the Court should not hesitate to follow its own precedent and reject Sarah's claim that "[t]he March 1984 conveyance clearly and unequivocally repudiated Hankins' [interest in the Property.]"

**M.** **Reply Point No. 13: Sarah's claim that she can rely on her parents' alleged repudiation of Hankins' title when they were not Hankins' co–tenants lacks merit.**

Sarah also disputes that Hankins' claim that she cannot rely on her parents' period of alleged adverse possession to her alleged period of possession. Specifically, Hankins asserted in his opening brief that for tacking to be effective, Roy and Norma must have met all the requirements of adverse possession at the time they allegedly repudiated Hankins' interest in the Property. *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 69 (Tex. 2011); TEX. CIV. PRAC. & REM. CODE § 16.023. They failed to do so because they were not co–tenants with Hankins at the time the July 1984 and September 1990 letters were sent. Sarah was Hankins' co–tenant at the time these letters were sent, not Roy and Norma. But it is Sarah, as Hankins' co–tenant, who must show unmistakable and hostile acts that would put her co–tenant, Hankins, on notice of her intent to oust him from the Property. *See Marshall*, 342 S.W.3d at 70 (citing *Todd v. Bruner*, 365 S.W.2d 155, 159–60 (Tex. 1963)). This is because "[t]he real property statutes of limitations as to cotenants are not designed to run in secrecy and silence." *Todd*, 365 S.W.2d at 160. Thus, Sarah cannot rely on her parents to do her bidding for her. Instead, she was required to repudiate Hankins' interest through unmistakable and hostile acts that would have put

33

Hankins on notice. She cannot anonymously repudiate her co–tenant's interest under Texas law. *See Todd*, 365 S.W.2d at 160.

### N. Reply Point No. 14: Sarah wants to eat her cake and have it too. On one hand, Sarah claims she is a stranger to this dispute. On the other hand, Sarah claims that the dispute was between Hankins and the Harris family, including her. Sarah cannot have it both ways.

It is interesting to note that after repeatedly claiming throughout her brief that she was a stranger to underlying events giving rise to this lawsuit, Sarah now claims the dispute at issue was between Hankins and the Harris family, including her. (*Compare* Resp. Br. at 48 ("The dispute was between Hankins and the Harris family.") *with* Resp. Br. at 35 ("[Sarah] is a stranger to the Hankins litigation and the Judgment."); *id.* at 36 ("Sarah is a stranger to the Hankins litigation, Judgment, and the attempted foreclosure."); *id.* at 39 ("Sarah had nothing to do with the underlying claims that led to the judgment, nor with the conveyances themselves."); *id.* at 1–2 ("Hankins has simply continued his campaign of harassment … long after Sarah's parents have passed away, even though Sarah had nothing to do with his original lawsuit."). Sarah should not be allowed to pick and choose when she wants to cast herself as a stranger to this dispute and when she wants a leading role depending on how convenient it is for her argument.

Regardless, Sarah's new claim that she has been in the middle of the adverse possession dispute with Hankins before 2005 belies the record.

As set forth in Hankins' opening brief, Sarah was not mentioned or copied on Hoffman's July 1984 letter; Hoffman copied Roy and Norma. (1 Supp. CR at 414). Hoffman did not state that he represented Sarah; Hoffman referred to Roy as "our client. (*Id.* at 407). There is no evidence that Hoffman ever represented Sarah. (*See id.* at 405–06 at ¶ 3) (Hoffman stated in his affidavit that he represented Roy with regard to the Property). The July 1984 letter does not establish as a matter of law that Sarah repudiated Hankins' interest or that Hoffman did so on Sarah's behalf.

Likewise, Hoffman's September 1990 letter fails to establish as a matter of law that Sarah repudiated Hankins' interest or that Hoffman did so on Sarah's behalf. Again, Sarah is not mentioned or copied on the September 1990 letter. (1 Supp. CR at 416–18). Rather, Hoffman refers to Norma as "our client." (*Id.* at 416). There is no evidence that Sarah was directly involved in any way with her parents' disputes with Hankins in 1984 and 1990. The earliest Sarah could have been directly involved would have been 2005. (1 Supp. CR at 439; 441–72) (Sarah's attorney resent Hoffman's documents to Hankins' attorney). Thus, there is no evidence that Sarah repudiated Hankins' interest in the Property before 2005.

**O. Reply Point No. 15: Despite Sarah's claim to the contrary, Sarah must establish title from the sovereign to prevail on her three–year adverse possession claim.**

Sarah next claims that she established the three year limitations period for an adverse possession claim as a matter of law. Specifically, she claims that she was not required to prove title from the sovereignty. Resp. Br. at 50. Sarah is wrong yet again. To prove adverse possession under the three year limitations period, Sarah must show adverse possession under "title or color of title." TEX. CIV. PRAC. & REM. CODE § 16.024. So, the party seeking to establish adverse possession must show title or color of title evidenced by a chain of transfers from the sovereign to the person in possession. *See Humphrey v. C.G. Jung Educ. Ctr. of Houston*, 624 F.2d 637, 641 (5th Cir. 1980). Title is defined as "a regular chain of transfers of real property from or under the sovereignty of the soil." Tex. Civ. Prac. & Rem. Code § 16.021(4). "Color of title" differs only to the extent that one or more of the transfers may be irregular. *Humphrey*, 624 F.2d at 641. The phrase "color of title" does not "dispense with the fundamental, basic requirement of a 'transfer' which actually passes the interest conferred by the original grant or patent." *Id.* (citing West, *The Texas Three Year Statute of Limitation*, 19 TEXAS L. REV. 375, 394 (1941)). Therefore, Sarah was required to prove title from the sovereign in order to establish adverse

possession under the three year limitations period. Sarah failed to do so. Thus, that portion of the summary judgment must be reversed.

**P.   Reply Point No. 16: Sarah's claim that there is "voluminous evidence" to support her adverse possession claim misses the mark. The evidence cited by Sarah to support her claim for adverse possession is nothing more than actions taken by the Harris family that is consistent with a co–tenancy.**

Sarah next claims there is voluminous evidence in the record to support her claim for adverse possession. Sarah is wrong yet again. The "voluminous" evidence Sarah cites are activities that are consistent with a co–tenancy. Resp. Br. at 51–53. These activities include living on the Property, receiving mail at the Property, making improvements to the Property, listing the Property as a home address with the Texas Department of Public Safety, paying property taxes, maintaining insurance, receiving utility bills, and maintaining the Property by having lawn maintenance performed. *Id.*   These activities are insufficient to establish adverse possession against a co–tenant as a matter of law.

Also, as set forth in Hankins' opening brief, the maintaining of utilities, keeping the property insured, paying taxes, making improvements on the property, and performing general maintenance is, without more, insufficient to establish an adverse possession claim against a co–tenant as a matter of law. *See Todd*, 365 S.W.2d at 160. The Harris family's alleged

usage of the Property is nothing more than undertaking and performing tasks consistent with a co–tenancy, which is insufficient to establish adverse possession as a matter of law. *Id.*

Regardless, Sarah claims she established her adverse possession claims as a matter of law through her family's use of the Property because the cases cited in Hankins' opening brief allegedly had "far more limited" evidence than what she presented. But if the question is a matter of degree, then a summary judgment is improper. Specifically, whether the Harris family "did enough" to adversely possess Hankins' interest in the Property by maintaining the Property, living there, paying taxes, and cutting the grass is a fact question for a jury and not an issue that can be resolved by summary judgment.

Finally, Sarah's claims about the number of pages of alleged summary judgment evidence she submitted to the trial court (including a fair amount duplicate information) invokes images of the cagey trial lawyer arguing that his client should win merely because he brought more witnesses and admitted more exhibits. Such a claim doesn't work for jury trials—juries are instructed otherwise. *See* TEX. PATTERN JURY CHARGES–NEGLIGENCE at §1.3(6) (2012) (jury is instructed that preponderance of the evidence "is not measured by the number of witnesses or by the number of documents

admitted in evidence."). If such a claim is insufficient for trial, it is certainly insufficient for summary judgment as a matter of law.

## Conclusion and Prayer

The trial court erred in granting Sarah's motions for summary judgment. At a minimum, Hankins' judgment and execution liens are still effective and thus, he has an interest in the Property. And even if the Court were inclined to affirm the voiding of the execution sale, equity warrants reviving Hankins' judgment and his liens. Hankins therefore requests that the Court reverse the trial court's grant of summary judgments in favor of Sarah Harris, reverse the final judgment, and remand this matter back to the trial court.

Respectfully submitted,

LEYH, PAYNE & MALLIA, PLLC


By: */s/ Sean M. Reagan*
      Sean Michael Reagan
      sreagan@lpmfirm.com
      Texas Bar No. 24046689
      9545 Katy Freeway, Suite 200
      Houston, Texas 77024
      Telephone: 713-785-0881
      Facsimile: 713-784-0884

**ATTORNEY FOR APPELLANT**

## Certificate of Service

I certify that a true and correct copy of this document has been served to all interested parties of record on December 7, 2015, as follows:

| | |
|---|---|
| William Feldman | *Via Email* |
| Michael J. Mazzone | *Via Email* |
| Michael T. Powell | *Via Email* |
| Robert Carlton | *Via Email* |
| Haynes & Boone, LLP | |
| 1221 McKinney Street, Suite 2100 | |
| Houston, Texas 77010-2007 | |
| | |
| Brian B. Kilpatrick | *Via Email* |
| H. Fred Cook | *Via Email* |
| Wilson, Cribbs & Goren, P.C. | |
| 2500 Fannin Street | |
| Houston, Texas 77002 | |
| | |
| Jarrett L. Ellzey | *Via Email* |
| W. Craft Hughes | *Via Email* |
| Hughes Ellzey, L.L.P. | |
| 2700 Post Oak Blvd., Suite 1120 | |
| Galleria Tower I | |
| Houston, Texas 77056 | |
| | |
| Hartley Hampton | *Via Email* |
| Hampton & King | |
| 3 Riverway, Suite 910 | |
| Houston, Texas 77056 | |
| | |
| Kenneth T. Fibich | *Via Email* |
| Texas Bar No. 06952600 | |
| 1150 Bissonnet | |
| Houston, Texas 77005 | |

*/s/ Sean M. Reagan*
Sean M. Reagan

## Certificate of Compliance

Under Rule 9.4 of the TEXAS RULES OF APPELLATE PROCEDURE, I certify that the foregoing document is a computer-generated document containing 7,490 words. The undersigned relied upon the word count feature on his word processor in determining the word count.

/s/ *Sean M. Reagan*
Sean M. Reagan